# HAM *v.* SOUTH CAROLINA

No. 71–5139.   Argued November 6, 1972—Decided January 17, 1973

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, Blackmun, and Powell, JJ., joined. Douglas, *post,* p. 529, and Marshall, JJ., *post,* p. 530, filed opinions concurring in part and dissenting in part.

*Jonathan Shapiro* argued the cause for petitioner. With him on the brief were *Jack Greenberg, James M. Nabrit III,* and *Anthony G. Amsterdam.*

*Timothy G. Quinn,* Assistant Attorney General of South Carolina, argued the cause for respondent.   With him on the brief was *Daniel R. McLeod,* Attorney General.

Mr. Justice Rehnquist delivered the opinion of the Court.

Petitioner was convicted in the South Carolina trial court of the possession of marihuana in violation of state law.[1]   He was sentenced to 18 months' confinement, and on appeal his conviction was affirmed by a divided

---

[1] S. C. Code § 32–1506 (1962).

South Carolina Supreme Court. 256 S. C. 1, 180 S. E. 2d 628 (1971). We granted certiorari limited to the question of whether the trial judge's refusal to examine jurors on *voir dire* as to possible prejudice against petitioner violated the latter's federal constitutional rights. 404 U. S. 1057 (1972).

Petitioner is a young, bearded Negro who has lived most of his life in Florence County, South Carolina. He appears to have been well known locally for his work in such civil rights activities as the Southern Christian Leadership Conference and the Bi-Racial Committee of the City of Florence. He has never previously been convicted of a crime. His basic defense at the trial was that law enforcement officers were "out to get him" because of his civil rights activities, and that he had been framed on the drug charge.

Prior to the trial judge's *voir dire* examination of prospective jurors, petitioner's counsel requested the judge to ask jurors four questions relating to possible prejudice against petitioner.[2] The first two questions sought to elicit any possible racial prejudice against Negroes; the third question related to possible prejudice

---

[2] The four questions sought to be asked are the following:

"1. Would you fairly try this case on the basis of the evidence and disregarding the defendant's race?

"2. You have no prejudice against negroes? Against black people? You would not be influenced by the use of the term 'black'?

"3. Would you disregard the fact that this defendant wears a beard in deciding this case?

"4. Did you watch the television show about the local drug problem a few days ago when a local policeman appeared for a long time? Have you heard about that show? Have you read or heard about recent newspaper articles to the effect that the local drug problem is bad? Would you try this case solely on the basis of the evidence presented in this courtroom? Would you be influenced by the circumstances that the prosecution's witness, a police officer, has publicly spoken on TV about drugs?"

against beards; and the fourth dealt with pretrial publicity relating to the drug problem. The trial judge, while putting to the prospective jurors three general questions as to bias, prejudice, or partiality that are specified in the South Carolina statutes,[3] declined to ask any of the four questions posed by petitioner.

The dissenting justices in the Supreme Court of South Carolina thought that this Court's decision in *Aldridge* v. *United States,* 283 U. S. 308 (1931), was binding on the State. There a Negro who was being tried for the murder of a white policeman requested that prospective jurors be asked whether they entertained any racial prejudice. This Court reversed the judgment of conviction because of the trial judge's refusal to make such an inquiry. Mr. Chief Justice Hughes, writing for the Court, stated that the "essential demands of fairness" required the trial judge under the circumstances of that case to interrogate the veniremen with respect to racial prejudice upon the request of counsel for a Negro criminal defendant. *Id.,* at 310.

The Court's opinion relied upon a number of state court holdings throughout the country to the same effect, but it was not expressly grounded upon any constitutional requirement. Since one of the purposes of the Due Process Clause of the Fourteenth Amendment is to insure these "essential demands of fairness," *e. g., Lisenba* v. *California,* 314 U. S. 219, 236 (1941), and since a principal purpose of the adoption of the Fourteenth Amendment was to prohibit the States from

---

[3] S. C. Code § 38–202 (1962). The three questions asked of all prospective jurors in this case were, in substance, the following:

"1. Have you formed or expressed any opinion as to the guilt or innocence of the defendant, Gene Ham?

"2. Are you conscious of any bias or prejudice for or against him?

"3. Can you give the State and the defendant a fair and impartial trial?"

invidiously discriminating on the basis of race, *Slaughter-House Cases,* 16 Wall. 36, 81 (1873), we think that the Fourteenth Amendment required the judge in this case to interrogate the jurors upon the subject of racial prejudice. South Carolina law permits challenges for cause, and authorizes the trial judge to conduct *voir dire* examination of potential jurors. The State having created this statutory framework for the selection of juries, the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that under the facts shown by this record the petitioner be permitted to have the jurors interrogated on the issue of racial bias. Cf. *Groppi* v. *Wisconsin,* 400 U. S. 505, 508 (1971); *Bell* v. *Burson,* 402 U. S. 535, 541 (1971).

We agree with the dissenting justices of the Supreme Court of South Carolina that the trial judge was not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by petitioner. The Court in *Aldridge* was at pains to point out, in a context where its authority within the federal system of courts allows a good deal closer supervision than does the Fourteenth Amendment, that the trial court "had a broad discretion as to the questions to be asked," 283 U. S., at 310. The discretion as to form and number of questions permitted by the Due Process Clause of the Fourteenth Amendment is at least as broad. In this context, either of the brief, general questions urged by the petitioner would appear sufficient to focus the attention of prospective jurors on any racial prejudice they might entertain.

The third of petitioner's proposed questions was addressed to the fact that he wore a beard. While we cannot say that prejudice against people with beards might not have been harbored by one or more of the potential jurors in this case, this is the beginning and

not the end of the inquiry as to whether the Fourteenth Amendment required the trial judge to interrogate the prospective jurors about such possible prejudice. Given the traditionally broad discretion accorded to the trial judge in conducting *voir dire, Aldridge* v. *United States, supra,* and our inability to constitutionally distinguish possible prejudice against beards from a host of other possible similar prejudices, we do not believe the petitioner's constitutional rights were violated when the trial judge refused to put this question. The inquiry as to racial prejudice derives its constitutional stature from the firmly established precedent of *Aldridge* and the numerous state cases upon which it relied, and from a principal purpose as well as from the language of those who adopted the Fourteenth Amendment. The trial judge's refusal to inquire as to particular bias against beards, after his inquiries as to bias in general, does not reach the level of a constitutional violation.

Petitioner's final question related to allegedly prejudicial pretrial publicity. But the record before us contains neither the newspaper articles nor any description of the television program in question. Because of this lack of material in the record substantiating any pretrial publicity prejudical to this petitioner, we have no occasion to determine the merits of his request to have this question posed on *voir dire.*[4]

---

[4] The record indicates that there was a brief colloquy between petitioner's counsel and the trial judge, in which the former apparently offered newspaper accounts and an editorial in support of his request that the question be propounded; the judge responded that he did not consider the items submitted prejudicial. The Supreme Court of South Carolina, discussing prejudicial publicity in the context of petitioner's claim that he was entitled to a change of venue, stated that "[t]he two newspaper clippings and one editorial concerning drug abuse did not name the defendant or refer in any way to his trial."

Because of the trial court's refusal to make any inquiry as to racial bias of the prospective jurors after petitioner's timely request therefor, the judgment of the Supreme Court of South Carolina is

*Reversed.*

MR. JUSTICE DOUGLAS, concurring in part and dissenting in part.

I concur in that portion of the majority's opinion that holds that the trial judge was constitutionally compelled to inquire into the possibility of racial prejudice on *voir dire*. I think, however, that it was an abuse of discretion for the trial judge to preclude the defendant from an inquiry by which prospective jurors' prejudice to hair growth could have been explored.

It is unquestioned that a defendant has the constitutional right to a trial by a neutral and impartial jury. Criminal convictions have been reversed when the limitations on *voir dire* have unreasonably infringed the exercise of this right. *Aldridge* v. *United States*, 283 U. S. 308. Such reversals have not been limited to incidents where the defendant was precluded from inquiring into possible racial prejudice. In both *Morford* v. *United States*, 339 U. S. 258, and *Dennis* v. *United States*, 339 U. S. 162, defendants were held to have the right to inquire into possible prejudices concerning the defendants' alleged ties with the Communist party. In *Aldridge* v. *United States, supra*, at 313, this Court made it clear that *voir dire* aimed at disclosing "prejudices of a serious character" must be allowed.

Prejudices involving hair growth are unquestionably of a "serious character." Nothing is more indicative of the importance currently being attached to hair growth by the general populace than the barrage of cases reaching the courts evidencing the attempt by one segment of society officially to control the plumage of another. On the

issue of a student's right to wear long hair alone there are well over 50 reported cases, *Olff* v. *East Side Union High School,* 404 U. S. 1042. In addition, the issue of plumage has surfaced in the employment-discrimination context, *Roberts* v. *General Mills, Inc.,* 337 F. Supp. 1055 (ND Ohio); *Conard* v. *Goolsby,* 350 F. Supp. 713 (ND Miss.), as well as the military area, *Friedman* v. *Froehlke,* 5 S. S. L. R. 3179 (Mass.).

The prejudices invoked by the mere sight of nonconventional hair growth are deeply felt. Hair growth is symbolic to many of rebellion against traditional society and disapproval of the way the current power structure handles social problems. Taken as an affirmative declaration of an individual's commitment to a change in social values, nonconventional hair growth may become a very real personal threat to those who support the *status quo*. For those people, nonconventional hair growth symbolizes an undesirable lifestyle characterized by unreliability, dishonesty, lack of moral values, communal ("communist") tendencies, and the assumption of drug use. If the defendant, especially one being prosecuted for the illegal use of drugs, is not allowed even to make the most minimal inquiry to expose such prejudices, can it be expected that he will receive a fair trial?

Since hair growth is an outward manifestation by which many people determine whether to apply deep-rooted prejudices to an individual, to deny a defendant the right to examine this aspect of a prospective juror's personality is to deny him his most effective means of *voir dire* examination.

MR. JUSTICE MARSHALL, concurring in part and dissenting in part.

I, too, concur in that portion of the majority's opinion which holds that the trial judge was constitutionally compelled to inquire into the possibility of racial prejudice on

*voir dire.* I also agree that, on this record, we cannot say that the judge was required to ask questions about pretrial publicity. I cannot agree, however, that the judge acted properly in totally foreclosing other reasonable and relevant avenues of inquiry as to possible prejudice.

Long before the Sixth Amendment was made applicable to the States through the Due Process Clause of the Fourteenth Amendment, see *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), this Court held that the right to an "impartial" jury was basic to our system of justice.

> "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. . . . In the language of Lord ,Coke, a juror must be as 'indifferent as he stands unsworne.' Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. *Thompson* v. *City of Louisville,* 362 U. S. 199. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' *Reynolds* v. *United States,* 98 U. S. 145, 155." *Irvin* v. *Dowd,* 366 U. S. 717, 722 (1961) (footnote omitted).

See also *Turner* v. *Louisiana,* 379 U. S. 466, 471–473 (1965); *Glasser* v. *United States,* 315 U. S. 60, 84–86 (1942).

We have never suggested that this right to impartiality and fairness protects against only certain classes of prejudice or extends to only certain groups in the population. It makes little difference to a criminal defendant whether

the jury has prejudged him because of the color of his skin or because of the length of his hair. In either event, he has been deprived of the right to present his case to neutral and detached observers capable of rendering a fair and impartial verdict. It is unsurprising, then, that this Court has invalidated decisions reached by juries with a wide variety of different prejudices. See, *e. g., Witherspoon* v. *Illinois,* 391 U. S. 510 (1968); *Irvin* v. *Dowd, supra; Morford* v. *United States,* 339 U. S. 258 (1950).

Moreover, the Court has also held that the right to an impartial jury carries with it the concomitant right to take reasonable steps designed to insure that the jury is impartial. A variety of techniques is available to serve this end, see *Groppi* v. *Wisconsin,* 400 U. S. 505, 509–511 (1971); *Sheppard* v. *Maxwell,* 384 U. S. 333, 357–363 (1966), but perhaps the most important of these is the jury challenge. See, *e. g., Johnson* v. *Louisiana,* 406 U. S. 356, 379 (1972) (opinion of POWELL, J.); *Swain* v. *Alabama,* 380 U. S. 202, 209–222 (1965). Indeed, the first Mr. Justice Harlan, speaking for a unanimous Court, thought that the right to challenge was "one of the most important of the rights secured to the accused" and that "[a]ny system for the empanelling of a jury that [prevents] or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned." *Pointer* v. *United States,* 151 U. S. 396, 408 (1894). See also *Lewis* v. *United States,* 146 U. S. 370, 376 (1892).

Of course, the right to challenge has little meaning if it is unaccompanied by the right to ask relevant questions on *voir dire* upon which the challenge for cause can be predicated. See *Swain* v. *Alabama, supra,* at 221. It is for this reason that the Court has held that "[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury," *Dennis* v. *United States,* 339 U. S. 162,

171–172 (1950), and that the Court has reversed criminal convictions when the right to query on *voir dire* has been unreasonably infringed. See, *e. g., Aldridge* v. *United States,* 283 U. S. 308 (1931). Contrary to the majority's suggestion, these reversals have not been confined to cases where the defendant was prevented from asking about racial prejudice. See, *e. g., Morford* v. *United States, supra.* Cf. *Dennis* v. *United States, supra.*[1]

I do not mean to suggest that a defendant must be permitted to propound any question or that limitless time must be devoted to preliminary *voir dire.* Although the defendant's interest in a jury free of prejudice is strong, there are countervailing state interests in the expeditious conduct of criminal trials and the avoidance of jury intimidation. These interests bulk larger as the possibility of uncovering prejudice becomes more attenuated. The trial judge has broad discretion to refuse to ask questions that are irrelevant or vexatious.[2] Thus, where the claimed prejudice is of a novel character, the judge might require a preliminary showing of relevance or of possible prejudice before allowing the questions.

But broad as the judge's discretion is in these matters, I think it clear that it was abused in this case. The defense attorney wished to ask no more than four questions, which would have required a scant 15 additional

---

[1] Indeed, it was not so confined in *Aldridge* itself, upon which the majority heavily relies. *Aldridge* pointed out that "[t]he right to examine jurors on the *voir dire* as to the existence of a disqualifying state of mind, has been upheld with respect to other races than the black race, and in relation to religious and other prejudices of a serious character." 283 U. S. 308, 313 (1931).

[2] I also agree with the majority that the judge may properly decline to ask the question in any particular form or ask any particular number of questions on a subject.

minutes of the court's time. The inquiries, directed *inter alia* to possible prejudice against people with beards, were obviously relevant, since the defendant was in fact bearded. Moreover, the judge afforded petitioner no opportunity to show that there were a significant number of potential jurors who might be prejudiced against people with beards. At minimum, I think such an opportunity should have been provided. I cannot believe that in these circumstances an absolute ban on questions designed to uncover such prejudice represents a proper balance between the competing demands of fairness and expedition.

It may be that permitting slightly more extensive *voir dire* examination will put an additional burden on the administration of justice. But, as Mr. Chief Justice Hughes argued 40 years ago, "it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute." *Aldridge* v. *United States,* 283 U. S., at 315.

I would therefore hold that the defendant in this case, and subject to the limitations set out above, had a constitutionally protected interest in having the judge propound the additional question, in some form, to the jury.