**UNITED STATES of America ex rel. David PRESTON, Petitioner,**

v.

**Hon. John J. ELLINGSWORTH, Warden, Sussex Correctional Institution, Respondent.**

Civ. A. No. 74–48.

United States District Court, D. Delaware.

Jan. 2, 1975.

John B. Kennedy, Wilmington, Del., for petitioner.

J. Dallas Winslow, Jr., Deputy Atty. Gen., Wilmington, Del., for respondent.

## MEMORANDUM OPINION

STAPLETON, District Judge:

This is a habeas corpus proceeding. Petitioner, a black, was indicted by an all white grand jury for the armed robbery of a liquor store in Kent County, Delaware. Counsel was appointed from the public defender's office. Petitioner was tried and convicted by an all white petit jury.

At trial, after several of the potential jurors had already been seated, petitioner asked his counsel to question the prospective jury members about racial prejudice toward blacks. Petitioner's counsel neither questioned the jurors on this point nor asked the court to do so.[1]

After the jury was impaneled, petitioner's counsel made a motion to quash the indictment based on alleged systematic exclusion from the grand jury panel of "members of the negro race and migrant workers."[2] Petitioner's counsel also moved to dismiss the case on the ground of alleged systematic exclusion of the same minority groups from the petit jury panel.[3] Lastly, petitioner's counsel moved for a continuance of one day in order to enable him to confer with two of petitioner's witnesses prior to the commencement of trial. The trial judge denied each of these motions.[4]

Subsequent to his conviction, petitioner appealed to the Delaware Supreme Court, complaining, *inter alia*, of the trial judge's refusal to grant the continuance, of the alleged exclusion of blacks and migrant workers from the grand and petit jury panels, and of what he maintained to be the incompetence of his trial counsel. On May 9, 1973, the Delaware Supreme Court rendered an opinion which upheld the trial judge's discretionary refusal to grant the continuance, and remanded petitioner to his state post-conviction remedies on the jury panel and incompetence of counsel issues.[5]

Petitioner promptly applied for post-conviction relief in the Superior Court of Delaware[6] and new counsel was appointed to represent him. A hearing was held on June 14, 1973 at which petitioner, his trial counsel, and the two current jury commissioners from Kent County testified. Thereafter, the Superior Court issued opinions denying relief on both claims.

Following the affirmance of these rulings by the Supreme Court, a petition for a writ of habeas corpus was filed in this Court.

## A. PETITIONER'S RIGHT TO AN EVIDENTIARY HEARING.

Petitioner filed his application in this Court *pro se*. He included a gener-

---

1. The Delaware practice, like that of this Court, is for the trial judge to conduct the voir dire.

2. Transcript of Trial Proceedings (hereinafter "T."), at 7.

3. *Id.*

4. *Id.* at 9–10.

5. *Preston v. Delaware*, 306 A.2d 712 (1973). The court ruled that the lack of a record with respect to these matters prevented their determination on direct appeal. 306 A.2d 713, 715–16.

6. Rule 35(a), Superior Court Criminal Rules, 13 Del.C.Ann. (West 1971).

alized request that the Court hold an evidentiary hearing. This request was subsequently made more specific and pressed by counsel appointed by this Court to represent petitioner. An evidentiary hearing was said to be necessary in connection with petitioner's ineffective assistance of counsel claim.[7] In a Memorandum Opinion dated October 23, 1974, this Court denied the application for an evidentiary hearing on the ground that a full record had been developed on this matter in the state courts and petitioner had made no showing, under the criteria set forth in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and enacted into statute in 28 U.S.C. § 2254(d), that another evidentiary hearing was necessary or desirable.

Subsequent to the Court's Memorandum Opinion, petitioner's counsel moved for reargument on the evidentiary hearing question. This motion was heard along with argument on the merits of the petition. The Court pointed out to counsel that the only record support for his motion were generalized statements in his brief that the performance of trial counsel had been defective. The Court, however, provided an additional opportunity to develop the record in support of the motion for an evidentiary hearing and instructed counsel, in petitioner's presence, that if petitioner had knowledge of any evidence not offered at the state hearing which would bear on the competence of trial counsel issue, he should describe that evidence with specificity in an affidavit and indicate why it had not been presented to the state court.

In response to the Court's invitation, an affidavit of petitioner was filed which reads in pertinent part as follows:

I, David Preston, being duly sworn according to law, do hereby depose and say . . .

That prior to and during the course of trial, defense counsel, neglected to interview witnesses, that the defense counsel never made an opening statement to the jury; that counsel never asked any questions of the jury, related to racial prejudice, nor did counsel effectively cross examine the prosecution witness Brian Moreland. That defense counsel never exercised any peremptory challenges. That counsel, nor the trial court, never asked any questions of the jurors, in regards to racial as well as any other biases that the jurors may have harbored at the onset of the trial.

That these and other related matters, were not made a part of record in any prior proceeding.

This affidavit does not move the Court to deviate from its ruling of October 23rd. The trial transcript (which was reviewed by the trial judge in connection with his post-conviction rulings and which has been read by this Court), the transcript of the post-conviction hearing and the trial court's conclusions of fact and law provide a full and complete record for determination of most of the matters referred to in petitioner's affidavit.[8] The conclusory allegation that "counsel neglected to interview witness," does not indicate what evidence, if any, petitioner has to offer and provides no reason for this Court to duplicate the opportunity heretofore provided by the state court. *Townsend v. Sain, supra,* 372 U.S. at 317–18, 83 S.Ct. 745; *United States ex rel. Cronan v. Mancusi,* 444 F.2d 51, 56 (2nd Cir. 1971), *cert. denied,* 404 U.S. 1003, 92 S.Ct. 572, 30 L.Ed.2d 556 (1971).

## B. TRIAL COURT'S FAILURE TO GRANT A CONTINUANCE.

■ Petitioner was arraigned on July 7, 1972. The trial was originally scheduled to commence on September 12, 1972, but was postponed until September 18, 1972 on application of the state. On the morning of trial, petitioner's counsel

---

7. Petitioner's Habeas Corpus Brief, at 13.

8. It is pertinent to note that petitioner's trial counsel did make an opening statement (T. 175) and did exercise peremptory challenges (Post-Conviction Hearing Record, DX 2).

announced to the court that two of petitioner's prospective witnesses had "missed their bus for emergency reasons at 11:00 o'clock last night which was the only one that could have gotten them here prior to the time to begin, and a time when they could have conferred with Mr. Preston's counsel so as to be better prepared for trial." T. 6–7. In response to this request for a continuance, the trial judge offered to postpone the start of the trial until that afternoon, it being anticipated that the tardy witnesses would arrive during the lunchtime recess. T. 9–10. Petitioner's counsel declined this offer. T. 10. The trial judge then denied the request for an overnight continuance and ordered the trial to proceed. *Id.*

Upon direct appeal of petitioner's conviction, the Supreme Court of Delaware rejected petitioner's due process contention on the following ground:

> [i]t appears that of the two witnesses referred to . . . one appeared in time to testify on behalf of the defendant but the other witness refused to lose time from work in Baltimore in order to attend. Under the totality of the circumstances, we cannot say that the Trial Judge abused his discretion by ruling as he did upon the request for postponement; nor are we convinced that the defendant was prejudiced thereby. There is nothing before us to show that the absent witness would have attended on another day. . . .[9]

Neither in conjunction with his direct appeal to the Delaware Supreme Court, nor in conjunction with his petition for habeas corpus in this Court, has petitioner made any allegation that the trial judge's ruling prejudiced the defense of his case in any way. Under the circumstances, and particularly in light of the fact that the decision to grant a continuance rests within the discretion of the trial court, *Avery v. Alabama,* 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377 (1940), the ruling of the Delaware Supreme Court would appear to be correct and will be adopted by this Court. *Cf. United States v. Hendrickson,* 417 F.2d 225 (3rd Cir. 1969), *cert. denied,* 397 U.S. 1026, 90 S.Ct. 1271, 25 L.Ed.2d 537 (1970) (neither defendant's right to due process nor his right to compulsory process were violated by the trial court's refusal to grant adjournment for purpose of recalling witness where testimony of the recalled witness would have been inadmissible); *Brady v. United States,* 433 F.2d 924 (10th Cir. 1970) (no error in denial of continuance to procure witness where witness's testimony, though possibly persuasive, would have been cumulative).

### C. PETITIONER'S GRAND AND PETIT JURIES.

Petitioner's second argument is that he was denied equal protection of the law because negroes and migrant workers were systematically excluded in the selection of the grand jury which indicted him and the petit jury which convicted him. This argument was not timely raised at the pre-trial stage and when it was raised at the commencement of the trial no evidence was offered in support of it. Nevertheless, the state courts chose to consider the matter on a record developed in a post-conviction proceeding and this Court will do likewise.

During the period here relevant, Delaware had a jury commissioner system for the selection of grand and petit juries. All persons qualified to vote, with certain exceptions not here relevant, were qualified to serve. In December of each year the jury commissioners for the county involved (2 in the case of Kent County) selected from the eligible citizens of the county the names of at least 50 people to serve, if summoned, as grand jurors, and the names of at least 150 people to serve, if summoned, as petit jurors. These names were placed in two sets of boxes, one set marked "Grand Jury" and the other "Petit Jury." In each set there was a box for each representative district in the county and the Jury Commissioner's selections

9. *Preston v. Delaware,* 306 A.2d 712, 714–15 (1973).

were distributed among those districts. 10 Del.C. § 4505.

From the Grand Jury boxes, the Jury Commissioners drew by lot those to be summoned for duty as grand jurors. Five of the ten persons to serve as grand jurors were selected from the odd numbered representative districts in the beginning of December for a year's service. The other five were selected from the even numbered districts in early June for a year's service. 10 Del.C. § 4507. From the Petit Jury boxes, the Jury Commissioners drew at the commencement of each term the names of those to serve as petit jurors during the coming term. The petit juror selections were similarly apportioned among the representative districts "as nearly equal as may be." 10 Del.C. § 4508.

Petitioner was tried at the September 1972 term of court. The evidence at the post-conviction hearing indicated that Kent County had a population, as determined in the 1970 census, of 83% white, 16% negro, and 1% other. The evidence further showed that the pool of 120 petit jurors selected for the period of petitioner's trial included 13 negroes, a proportion of approximately 11%. The petit jury panel of 37 sitting the day petitioner's petit jury was selected included 4 negroes, also a proportion of approximately 11%. The jury selected from this group to try the case was all white, however.

Petitioner was indicted on December 6, 1971. All of the 8 grand jurors who attended the session at which petitioner's indictment was handed down were white. No evidence was introduced regarding the number of negroes whose names had been placed in the grand jury boxes the preceding December. The record shows that the trial judge, following the hearing, caused an investigation to be conducted to see if the contents of both the grand jury and petit jury boxes could be determined. He determined that this information could not then (i. e. June 14, 1973) be ascertained.

One Jury Commissioner, who had served from 1969 to 1973, testified during the post-conviction hearing that the same procedure had been utilized throughout his tenure for the selection of grand and petit jurors and that under this procedure an affirmative effort was made to see that 20% of the people whose names were placed in the boxes were negroes. A second Jury Commissioner gave confirming testimony of this practice. It developed, however, that he was appointed in 1971 and, accordingly, would not have had direct personal knowledge concerning the filling of the grand jury boxes in December of 1970.

No evidence was introduced in support of the claim that there had been a systematic exclusion of migrant workers.

On this record, the trial court concluded as follows:

Kent County has a population which is 83% white, 16% negro, and 1% other. The Grand Jury that indicted Mr. Preston on December 6, 1971 was all white. The trial jury that sat in Mr. Preston's trial was all white. The jurors selected for the petit jury panel during the period of Mr. Preston's trial included 13 negroes out of 120. The petit jury panel sitting the day Mr. Preston's jury was selected included 4 negroes out of 37 (Mrs. Ollie Mason, Abel Winder, Clorrie J. Collins, Enoch Jackson). The State's 4 witnesses were 2 white, including the victim, and 2 black.

The Jury Commissioners select the names of the persons who go into the jury selection boxes. They try to have 20% negroes. There is no way to control the number or percentage of negroes actually drawn for the Grand Jury and petit jury panels. There is nothing in the record to show the percentage of the negroes actually in the boxes at the time the Grand Jury and petit jury panels involved in this case were drawn and this information cannot now be ascertained.

On the basis of the above facts, which are supported by the record, the record in this case fails to demonstrate a systematic exclusion of negroes in

the jury selection process. Subject to the general statutory qualification that jury service is an obligation of all persons qualified to vote at the general election, there is no evidence to support a systematic exclusion of migrant workers although obviously qualified migrant workers who are not actually registered to vote may be difficult to identify. The first ground is therefore without merit. . . .

In *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), the Supreme Court noted that "although a defendant has no right to demand that members of his race be included on the ground jury that indicts him, he is entitled to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors in the administrative of justice." 405 U.S. at 628–29, 92 S.Ct. at 1224. The same principles, of course, apply to petit juries. The court in *Alexander* went on to hold that a defendant making a claim of systematic exclusion may establish a *prima facie* case by showing (1) an opportunity for discrimination and (2) statistical data concerning the proportion of blacks chosen in the selection process and the proportion of blacks in the eligible population which give rise to the inference that the end result was produced by discrimination rather than chance. The court emphasized, however, that it "has never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors." *Id.* at 630, 92 S.Ct. at 1225.

■ This Court agrees with the trial judge and the Delaware Supreme Court

that petitioner did not establish a *prima facie* case and that relief on this ground must be denied. It may be conceded that Delaware's Jury Commissioner system of selecting names for the jury boxes may provide an "opportunity for discrimination" at the initial stage of the selection process as that concept is articulated in *Alexander*. The available data, however, does not give rise to an inference of systematic exclusion. Rather, it suggests that the system produced results which do not offend the equal protection clause.

While the immediate result of the Jury Commissioner's selection of petit jurors was no longer available at the time of the post-conviction hearing, the record demonstrates that random selection from the pool so created, at two successive stages, produced panels with an 11% black population. Petitioner's petit jury was concededly chosen by lot from such a panel. While no evidence was offered of the percentage of blacks among those eligible for jury duty in Kent County, the 1970 census figures show an overall black population of 16%. The disparity between 11% and 16% does not approach those disparities which have been held by the Supreme Court to constitute a *prima facie* case of systematic exclusion [10] and is not, in this Court's judgment, statistically significant.

■ It is true that the statistical record does not provide comparable evidence of the results of grand jury selection process. The black population of the grand jury pool selected by the Jury Commissioners cannot be determined and we know only that a random selection from that pool produced eight white jurymen who handed down the true bill in

10. In the *Alexander* case, for example:

. . . 21% of the population was Negro and 21 or over, therefore presumptively eligible for grand jury service. Use of questionnaires by the jury commissioners created a pool of possible grand jurors which was 14% Negro, a reduction by one-third of possible black grand jurors. The commission-

ers then twice culled this group to create a list of 400 prospective jurors, 7% of whom were Negro—a further reduction of one-half. The percentage dropped to 5% on petitioner's grand jury venire and to zero on the grand jury that actually indicted him. . .

405 U.S. at 629–30, 92 S.Ct. at 1225.

petitioner's case. *Alexander* and its predecessors do not require, however, that the fact of an all white grand jury be considered in a vacuum. Where the evidence indicates, as it does here, that virtually the same selection process produced petit jury panels having an 11% black population, the fact that no blacks served on petitioner's grand jury does not give rise to the inference of discrimination which provides the foundation of a *prima facie* case of systematic exclusion.

## D. THE ADEQUACY OF PETITIONER'S REPRESENTATION AT TRIAL.

In *Moore v. United States*, 432 F.2d 730 (3rd Cir. 1970), the Third Circuit Court of Appeals clarified the law regarding the effective assistance of counsel by holding that indigent defendants are entitled to "legal services of the same level of competency as that generally afforded at the bar to fee-paying clients," 432 F.2d at 736, and that this rule is applicable to indigent defendants in the state, as well as the federal, courts. *Id.* at 737. In *Moore*, the court ruled that the standard of adequacy is "the exercise of the customary skill and knowledge which normally prevails at the time and place." *Id.* at 736. In announcing this standard, the court in *Moore* referred to Section 299(a) of the *Restatement (2d) of Torts.* That section provides:

> Unless he represents that he had greater or less skill or knowledge, one who undertakes to render the services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

As the court in *Moore* observed, the ultimate issue "is not whether defendant was prejudiced by his counsel's act or omission, but whether counsel's performance was at the level of normal competency." *Id.* at 737. Elaborating on this point, the court stated:

A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard. Perfection is hardly attainable and certainly is not the general rule, especially in professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances. . . . [S]ince what is required is normal and not exceptional representation, there is room for the realization that it would be difficult to find a case where even the ablest and most experienced trial lawyer would be completely satisfied after a searching re-examination of his conduct of a case. *Id.*

It is by this standard that the conduct of defense counsel must be judged.

Petitioner and a codefendant were charged with robbery of a liquor store. The state had four witnesses. The principal witnesses were the operator of the liquor store, who positively identified petitioner as one of three negro males who bound, gagged and robbed him, and one Brian Moreland, who testified that he and the two defendants planned and executed the robbery. Moreland's girl friend and a state trooper corroborated portions of the testimony of the state's principal witnesses. Petitioner called five witnesses, three of whom gave testimony tending to establish an alibi for petitioner.

During the trial, petitioner's counsel exercised peremptory challenges, made an opening statement, cross-examined the state's witnesses, elicited exculpatory testimony from petitioner's witnesses, made a closing statement, and asked for appropriate jury instructions. On several occasions counsel raised objections to the admissibility of various items of evidence and made arguments in support thereof which demonstrated a sound grasp of the rules of evidence. In addition, counsel's lengthy cross-examination of the two principal witnesses for the state evidenced considerable thought and preparation. The cross-examination of

Moreland, for example, demonstrated that the witness had made a prior statement substantially inconsistent with his trial testimony, had been granted immunity by the state, and had reason to harbor personal animosity towards petitioner. Counsel also secured an admission from Moreland that on a prior occasion in Georgia, he had given a statement to the police implicating petitioner in a crime and had later retracted the statement in court.

In his opinion following the post-conviction relief hearing, the trial judge concluded that "viewing the case as a whole, the defendant was vigorously and ably represented throughout trial by his attorney." This Court's independent study of the trial transcript has led it to the same conclusion.

■ Petitioner's position that his trial counsel's performance nevertheless did not pass constitutional muster is based upon the conceded fact that counsel, despite a request by petitioner, did not ask voir dire questions of the jury panel concerning racial prejudice.[11] After the post-conviction hearing, the trial court made the following findings of fact concerning this matter:

. . . Defendant did in fact request counsel to ask voir dire questions regarding racial prejudice. Although some dispute exists as to the precise time the request was made, it is clear that it was made at least at a time when several jurors were already seated in the box. The Court finds that defense counsel first realized the defendant's desires at that time. Defense counsel refused defendant's request for two reasons. First, it was no longer timely under our practice to submit such questions. Second, it was bad trial tactics to ask such questions where, in the opinion of counsel, race was not an issue.[12]

**11.** Petitioner understandably does not contend that his counsel's failure to voir dire the jury panel on racial prejudice violated any constitutional right other than his Fourteenth Amendment right to effective assistance of counsel. In *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), the Supreme Court held that the Fourteenth Amendment requires a state to provide an opportunity to meaningfully voir dire the jury panel regarding racial prejudice. A state's duty in this regard is not unlike its duty to provide an opportunity for cross-examination of the state's witnesses and an opportunity for the defendant to testify in his own behalf. As the trial judge in this case pointed out, the defendant's right under *Ham*, like his right of confrontation, is an important one. The state's duty in cases of this kind is fulfilled, however, when it provides an opportunity for the exercise of the defendant's right. The decision whether the defense will avail itself of such an opportunity will in most instances involve the exercise of a judgment which should be left to competent defense counsel who is the one in the best position to determine which course of action is in the client's best interest. Accordingly, in the absence of extraordinary circumstances, if competent defense counsel makes a strategy decision in the course of trial not to take advantage of the opportunity afforded by the State, the defendant cannot later complain of a Fourteenth Amendment violation even though counsel's decision may not have had his bless-

ing. Cf. *Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); *United States ex rel. Cornitcher v. Rundle*, 285 F.Supp. 625 (E.D.Pa.1968), aff'd, 406 F.2d 773 (3rd Cir. 1969); *Nelson v. People of California*, 346 F.2d 73, 81–82 (9th Cir. 1965); *Martin v. United States*, 101 U.S.App.D.C. 329, 248 F.2d 651 (1951).

In this case, there is no evidence that the State of Delaware breached its duty under *Ham*. In *Matthews v. State*, 276 A.2d 265 (Del.Supr.1971), a case decided before petitioner's case came to trial, the Delaware Supreme Court declared that the failure of the trial court to voir dire the jury on racial prejudice constituted reversible error. The trial court undoubtedly would have followed the mandate of *Matthews* if, as in *Ham*, voir dire on this subject had been requested. Here, neither the court nor the prosecutor obstructed petitioner's access to the jury panel for this purpose. In this context, the Court concludes that the sole question presented is whether petitioner was denied his right to effective assistance of counsel.

**12.** Petitioner's trial counsel testified as follows at the postconviction hearing:

[a]s a matter of trial strategy . . . prejudice wasn't involved in this case particularly because two of the state's three key witnesses were black, and one of my jobs was to discredit Brian Moreland, in particular, who I would consider the state's key witness

With respect to the first basis for counsel's refusal, the state court concluded:

. . . There is no doubt that this Court should have inquired into the racial prejudice of the jurors had it been requested to do so, even after the seating of several jurors. Its failure to do so would have constituted reversible error. *Preston v. State*, Del. Supr. [306 A.2d 712], No. 228 (1973); *Matthews v. State*, Del.Supr., 276 A.2d 265 (1971). See also *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). I do not believe the first ground justifies counsel's refusal even if the defendant's request came as late as the jury seating procedure.

With respect to counsel's second reason for refusing petitioner's request, the court found:

Counsel's second ground for refusal lies in the nebulous area of trial strategy and the personal judgment and experience of counsel. Undoubtedly, counsel's wisdom in determining that race was not an issue is debatable, considering the fact that the defendant is black and the victim is white. Nevertheless, it is difficult to conclude that counsel's fault, if any, was at best anything more than a common mistake of judgment in the pressure of trial which anyone could make. Indeed, counsel's judgment may well have been correct since inquiry into racial prejudice may, as a practical matter, be unlikely to produce an affirmative response and can easily be misunderstood as an attempt to inject race into the case. Certainly, reasonable counsel can differ on whether or not the question should be asked.

\* \* \* \* \* \*

It seems clear that while an attorney may not, without good reasons,

who was black, and any prejudice there were, if it existed, would have cut both ways. So that on that basis, looking at it from the tactics I had for the trial, the question of prejudice was not one which was particularly of concern to me as Mr. Preston's lawyer.

represent his client in a manner inconsistent with his client's desires, he may exercise independent judgment on matters at trial if he reasonably believes that such actions are in the best interests of his client. Our Disciplinary Rules provide that:

"(B) In his representation of a client, a lawyer may: (1) where permissible, exercise his professional judgment to waive or fail to assert a right or position of his client." D R 7–101(B)(1).

In this regard it should be remembered that defense counsel is given broad latitude in the conduct of his representation of an accused. Oftentimes, matters of defense strategy and trial tactics require the particular skills and experience of counsel. Undoubtedly, disagreement may exist between client and counsel on innumerable points of trial strategy, but counsel's decision will be upheld unless the decision seriously and unduly prejudices the interests of the client to the extent that the client is denied genuine and effective legal representation. See *Brookhart v. Janis*, 383 U.S. 1, 8, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (Harlan, J., Separate opinion).

■ This Court agrees that when counsel, after consultation with his client, makes a strategy judgment in the course of trial and acts upon that judgment in a manner inconsistent with this client's wishes, the failure of counsel to follow the client's instructions does not *per se* constitute ineffective assistance of counsel in the constitutional sense. *United States ex rel. Cornitcher v. Rundle*, 285 F.Supp. 625 (E.D.Pa.1968), *aff'd*, 406 F.2d 773 (3rd Cir. 1969); *Nelson v. California*, 346 F.2d 73 (9th Cir. 1965); *Pierce v. Hudspeth*, 126 F.2d 337 (10th

Transcript of Post-Conviction Hearing of June 14, 1973 (hereafter "Post-Conviction Hearing"), at 23.

Cir. 1942); *Martin v. United States*, 248 F.2d 651 (D.C.Cir. 1957).

Petitioner's counsel made a strategy judgment in the heat of battle. It was a rational judgment and this Court cannot say under the circumstances of this case that it was an imprudent one. Even if it be assumed, however, that counsel should have followed petitioner's wishes in the matter, it is clear that counsel's overall performance met the standards announced in *Moore v. United States*, 432 F.2d 730 (3rd Cir. 1970).

Petitioner is not entitled to relief.