UNITED STATES of America,
Plaintiff-Appellee,

v.

Alfonso S. PADILLA,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Felix MIKE, Defendant-Appellant,

Edward Robinson, Defendant-Appellant,

Anita Louise Hess,
Defendant-Appellant.

Nos. 75–1539, 75–1465.

United States Court of Appeals,
Ninth Circuit.

Oct. 23, 1975.

Rehearing and Rehearing En Banc
Denied March 9, 1975.

Michael D. Nasatir (argued), of Nasatir, Sherman & Hirsh, Beverly Hills, Cal., for defendants-appellants.

Michael Sloner, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

## OPINION

Before BARNES and GOODWIN, Circuit Judges, and SCHNACKE, District Judge.*

SCHNACKE, District Judge:

Hess, Robinson, Mike, and Padilla appeal from their convictions, after jury trial, for possession of heroin with intent to distribute and distribution, and for conspiracy to so possess and distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846. Robinson also appeals from his conviction for using a telephone in facilitating the conspiracy, in violation of 21 U.S.C. § 843(b).

■ Hess requested that each juror be asked on voir dire what his reaction was to the fact that Hess is Caucasian and her co-defendants Robinson and Lawson (the latter not involved on this appeal) are black. The trial judge asked if any jurors would be prejudiced against any defendant because of either his or her race or the make-up of the defendants as a group. He got a negative response. Appellants now first urge that the question was inadequate, but at trial they made no further request for clarification. The trial judge has broad discretion as to what voir dire questions are asked, and a question asking for a "yes" or "no" answer as to the existence of racial prejudice can be adequate [*Ham v. South Carolina*, 409 U.S. 524, 525n, 527, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973)], and was, in fact, sufficient in the case at bar.

■ The trial judge initially instructed the jury that an essential element of conspiracy is that "the accused or any of them" willfully became members of the conspiracy. However, after defense counsel indicated the error in including "or any of them," the judge reread his whole instruction on essential elements of conspiracy, correctly stating that one essential element is that "the accused" willfully became a member of the conspiracy. Defense counsel made no objection at trial that the re-instruction confused the jury, and it was sufficient to make it clear to the jury that the second instruction superseded the first and that they were to disregard the first instruction.

■ The prosecutor, in closing argument, referred to an arrest of Mike two days after he and the others were arrested. Mike contends that this made it sound as if he was arrested on some other charge. But any jury confusion on this point was totally cured by the judge's instruction that both arrests arose out of the transaction charged in the indictment and that the jurors were not to infer or suspect that the rearrest related to any other matter.

* Honorable Robert H. Schnacke, United States District Judge of the Northern District of California, sitting by designation.

310

■ Mike and Padilla contend that the evidence shows little or no connection between each of them and their co-defendants, so that the evidence was insufficient to support their convictions. A consideration of the facts shows differently.

On November 26, 1974, Philadelphia Police Officer John D'Amico, acting in an undercover capacity, met with defendant Lawson in Philadelphia, Pennsylvania, and purchased heroin from him. In subsequent meetings, Lawson advised D'Amico that Lawson's source of the supply of heroin was in Los Angeles, California, and that a man named Eddie, who owned a car shop of some type, was that source. Lawson further advised that an individual by the name of Mike was Eddie's "main man".

On December 10, 1974, Lawson, by agreement with D'Amico, flew to Los Angeles to arrange for a large sale of heroin to D'Amico. D'Amico informed Lawson that his money was already in Los Angeles and that Lawson should fly to Los Angeles and then contact D'Amico in Philadelphia once Lawson had seen the heroin.

On the afternoon of December 10, 1974, agents established surveillance at Los Angeles Airport. Lawson was observed arriving at the airport at 2:00 p. m. Defendant Robinson ("Eddie") was observed picking up Lawson at 6:00 p. m. on that date. The two men drove to 245 Ridgewood Place, arriving at 6:50 p. m. At 7:35 p. m. on December 10, Lawson and Robinson reentered their car, a dark blue Cadillac, and drove to 410 South Hobart, where they remained for 45 minutes before returning to 245 Ridgewood Place.

At 10:00 p. m. that evening D'Amico received a phone call from Lawson, who stated that he was in Los Angeles and had seen the package of heroin. Lawson told D'Amico to meet him the next day to complete the sale in Los Angeles. Lawson gave D'Amico his telephone number in Los Angeles and a local address of 134 South Normandie Avenue.

Surveillance was established on the 245 Ridgewood Place address on the morning of December 11, 1974. The dark blue Cadillac was parked in the vicinity, as was a 1975 brown Cadillac. At 12:30 p. m., Felix Mike left the 245 Ridgewood Place address and drove off in the brown Cadillac. At 2:50 p. m. the dark blue Cadillac arrived at 134 South Normandie, and the male driver entered 134 South Normandie.

On the afternoon of December 11, 1974, Officer D'Amico arrived in Los Angeles and attempted to call Lawson at the telephone number Lawson had provided to him. After determining that Lawson had given him an incorrect number, D'Amico called Robinson at about 2:00 p. m. Robinson gave D'Amico the correct telephone number and said Lawson was at 134 South Normandie, the same address that had been provided by Lawson on the preceding evening.

Following two additional telephone conversations with Lawson at 2:00 p. m. and 2:25 p. m. D'Amico again telephoned Robinson at 4:20 p. m., and Robinson indicated at that time that the package was not all together, but that his people would be bringing it in twenty minutes or so.

5:35 p. m., Hess arrived in a vehicle at the Normandie address, and entered the premises carrying a large handbag.

At 6:00 p. m., Padilla arrived at the Normandie address, exited his truck, walked to the front door of the premises, and then returned to his truck and left without entering the premises. At approximately 6:30 p. m., Felix Mike and two other individuals arrived at the Normandie address and entered the premises, where they remained for a short time before they all returned to Mike's vehicle and departed. At 6:40 p. m., Padilla returned to the Normandie address accompanied by a male and two female companions. All entered the premises. Padilla was carrying a brown paper sack at that time. D'Amico had arranged with Robinson during their last phone conversation for the parties to meet at the

Marriott Hotel near the airport at 6:30 p. m. to complete the sale. At 7:30 p. m., D'Amico again called the Normandie address and was advised by Robinson that he had the heroin and that it would take about 35 minutes to get it to the Marriott. Mike arrived at the Normandie address at 7:45 p. m., and entered the premises. A few minutes later, Mike, Hess, Robinson, Lawson, Padilla, and one other individual left the premises on Normandie and entered the vehicle which had been driven to that location by Mike. Robinson was carrying a very large brown paper bag, and Hess was carrying a large handbag.

Mike then drove the car containing the six individuals to the Marriott Hotel, where he parked the car in the hotel's west parking lot. Lawson, Hess, Robinson, and Mike left the car and entered the hotel, with Hess still carrying the large handbag. Padilla and the sixth member of the group remained in the vehicle.

It had been agreed that the parties would meet in the hotel lobby and negotiate in D'Amico's room at the Marriott Hotel. D'Amico met with Lawson and Hess in the lobby at 8:30 p. m., and they proceeded to D'Amico's room. Lawson was carrying a large brown paper bag, and Hess was carrying the large handbag. Hess had five pounds of heroin in the large bag that she was carrying. The brown paper bag contained a scale. Lawson and Hess were placed under arrest in the hotel room. Mike and Robinson were arrested in the hotel lobby, and Padilla was arrested in the car in the parking lot.

The evidence permits the conclusion that Mike participated in the arrangements for delivering the heroin which were made on the evening of December 10, at 410 South Hobart. The evidence further permits the conclusion that Padilla and Mike participated in the collection of the narcotics at 134 South Normandie during the afternoon of December 11. Padilla brought the scale, in a brown bag. Hess brought the heroin. Mike was there before and after the her-

oin arrived. Shortly thereafter, Padilla, Mike, and the others drove with the heroin and the scale to the Marriott Hotel. Padilla was stationed in the parking lot and Mike in the lobby while the heroin was to be delivered and sold. The jury could properly conclude that they were there as look outs and to protect their interests in the heroin sale.

There is ample evidence to permit a rational conclusion by the jury that the accused were guilty beyond a reasonable doubt.

Mike finally contends that, aside from the judge's instruction on essential elements of conspiracy, another part of the conspiracy instruction was erroneous. However, we need not consider this contention because: (a) This part of the conspiracy instruction was not objected to by Mike's counsel before the jury retired to consider its verdict [see F.R. Crim.P., Rule 30]; and (b) Mike received concurrent sentences on all three counts on which he was convicted, and two of these counts were not based on conspiracy [see *U. S. v. Faulkenbery*, 472 F.2d 879, 882 (9th Cir. 1973), *cert. denied*, 411 U.S. 970, 93 S.Ct. 2161, 36 L.Ed.2d 692 (1973)].

Affirmed.