**Alvin ST. LAWRENCE, Petitioner,**

v.

**Charles SCULLY, Superintendent, Greenhaven Correctional Facility, Respondent.**

**No. 81 Civil 4314.**

United States District Court,
S. D. New York.

Oct. 13, 1981.

Howard B. Comet, William E. Hellerstein, New York City, for petitioner.

Eugene Gold, Dist. Atty., Kings County, Brooklyn, N.Y., for respondent; Michael Yoeli, Asst. Dist. Atty., Brooklyn, N.Y., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner, Alvin St. Lawrence, was convicted upon a jury trial in the Supreme Court of the State of New York, Kings County, of the crimes of robbery, rape and sodomy. He was sentenced to and is now serving concurrent prison terms of eight and one-third years to twenty-five years on each count except that the sentence on a second degree robbery charge is an indeterminate term of five to fifteen years. A co-defendant, Joel Lee James, was also convicted at the joint trial. The judgment of conviction was affirmed without opinion[1] and leave to appeal to the Court of Appeals was denied. The victim of the crimes is a white woman, a young college professor, and the petitioner and his co-defendant are black. The petitioner seeks a writ of habeas corpus to void his judgment of conviction pursuant to 28 U.S.C. § 2254 upon allega-

1. *People v. St. Lawrence*, 73 A.D.2d 1065, 423 N.Y.S.2d 974 (1980).

tions that he was denied his federal constitutional right to an impartial jury and to due process of law under the Sixth[2] and Fourteenth Amendments to the United States Constitution by (1) the trial judge's limitation of voir dire questioning of jurors about racial prejudice; (2) the allowance to the prosecution of its challenge for cause of a black venireman; and (3) the comments by the prosecutor in opening and concluding statements that deprived him of his right to the presumption of innocence and relieved the prosecution of its burden of establishing guilt beyond a reasonable doubt. In view of the claims made by petitioner, this Court has read word-for-word the voir dire transcript consisting of 626 pages in order to get the full and total atmosphere of that proceeding rather than to rely upon isolated references which may distort rather than inform as to what occurred; and since one claim rests upon incidents occurring during the prosecutor's opening and summation, the Court has also read the 463 page trial record so that the incidents may be considered in proper perspective against the totality of the trial testimony. The voir dire extended over a period of four days. The trial itself was completed and the verdict returned within three days.

The events about which the charges against petitioner and his co-defendant center occurred in the early evening of January 27, 1978 in the last passenger car, which was empty, of a ten-car moving subway train on a northbound Lexington Avenue express where the victim was raped, sodomized, assaulted and robbed. She testified that each assailant was armed with a long butcher knife. In the course of a series of revolting events, extending over a half hour, and which need not be detailed here, she also was forced at knifepoint to take from her leather travel purse a five dollar bill, five one dollar bills, two subway tokens and some change, which she handed to one

of her assailants, who then took from her left hand her wedding ring. She was also forced to give to the other assaulter her wrist watch. During the assaultive activities, she was pushed into the conductor's cab of the car and the assailants started to tear off her clothes. She managed to pull the emergency cord bringing the train to a sudden stop in the tunnel between the Borough Hall Station in Brooklyn and the Bowling Green Station in Manhattan. The conductor of the train thereupon walked through cars six to nine and when he reached the tenth car, he saw only three persons, the complainant and two men, both of whom were identified upon the trial by her as well as others who played a role in apprehending them as related hereafter. The victim was told by the conductor to go to the ninth car and while alone with the two men in the tenth car he was threatened by one of them who had a knife in his hand, whereupon he retreated to the ninth car. The assailants were observed leaving the train between the cars and getting onto the catwalk alongside the rails. The train was reactivated and proceeded to the Bowling Green subway station where the victim immediately gave authorities a description of her assailants.

Thereupon the motorman of the train following the one in which the complainant had been attacked was alerted by radio to be on the lookout for two men in the roadbed of the subway tunnel between Borough Hall and Bowling Green. About six hundred feet into the tunnel the motorman spotted two men against the wall. He stopped the train to pick them up, and the two men boarded and went to the back of the train. The motorman then advised the subway Command Center that the two men were on his train. He was directed to proceed and to stop his train after it was one car length into the Bowling Green Station. When the train stopped, the complainant,

---

**2.** A defendant in a state court prosecution is guaranteed an impartial jury by the Sixth Amendment as applicable to the States through the Fourteenth Amendment, *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968). Principles of due process also guarantee a defendant an impartial jury. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *see also Ristaino v. Ross*, 424 U.S. 589, 595 n.6, 96 S.Ct. 1017, 1020 n.6, 47 L.Ed.2d 258 (1976).

accompanied by police officers, entered the train. The complainant, after walking through five or six cars and seeing approximately 100 people, of whom at least thirty or forty were black, identified the petitioner Alvin St. Lawrence, seated on a double chair next to the conductor's cab as one of her assailants.[3] He was arrested and searched and a butcher's knife was found secreted under his arm. The complainant identified this knife as the one petitioner had during the attacks upon her.

After the complainant and the police entered the stopped train at the Bowling Green Station, the motorman saw a man dressed in a green army coat running along the catwalk from the side of the train near the wall and up the stairs at the Bowling Green Station. A transit officer, who pursuant to instructions was at the Bowling Green Station, also observed a man wearing a long green army coat running up the catwalk, dash up the stairs and flee to the street. The officer gave chase, and while in pursuit kept the fleeing man in sight until he turned a corner. The officer searched the street into which the fleeing man had run, and finally spotted him crouching in a space under a grating where he arrested him. Upon his return to the Bowling Green Station with the arrested man, the complainant identified Joel Lee James, the co-defendant, as the other of her assailants. An immediate search of James revealed a five dollar bill, five one dollar bills, two tokens and some loose change. Complainant had testified that she had been knifed during the experience and was bleeding. Clothing removed from each defendant immediately following his arrest had blood on them. Also, St. Lawrence's clothes as well as his hands and sneakers were covered with a sooty substance, "like what you find in the subway." Neither defendant testified; the defense essentially was that the State had failed to sustain its burden of establishing guilt beyond a reasonable doubt.

Against the foregoing summary of trial testimony we consider petitioner's various contentions.

1. The claim that the Trial Court's limited voir dire questioning on racial prejudice denied petitioner an impartial jury.

At the outset, to put matters in proper focus, it is desirable to note what this application does not encompass. Despite the statement in petitioner's brief that selection of an impartial jury was complicated by the related problems of pre-trial publicity and the fact that this was an interracial rape case, prejudicial pre-trial publicity is not an issue on this application. There is no claim by petitioner that pre-trial publicity deprived him of his right to a fundamentally fair trial, and, indeed, if it were made, the record would require its rejection. The incident which gave rise to the indictment occurred on January 27, 1977 and was publicized on the following day in the New York City newspapers, principally in the New York *Daily News* and the *New York Post.* The trial took place ten months later in late November. At the start of the trial, the Court conferred with the prosecution and defense as to an acceptable formula in the questioning of jurors to avoid the impact of any reference to the publicity.[4] Many who were called into the jury box had not seen or heard any publicity about the case; those who did were excused.[5] Thus the issue on this application is confined to petitioner's claim based upon the voir dire.

■ The Supreme Court, in *Ristaino v. Ross,*[6] has held that there is no absolute constitutional entitlement on the voir dire

---

3. A *Wade* hearing was held as to petitioner at which she identified him as one of her assailants (Wade hearing, Nov. 23, 1977, at 4, 18, 36) (hereafter Wade hearing). *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). James, the co-defendant, waived his right to a *Wade* hearing (Wade hearing at 36).

4. Record, November 21, 1977 at 2–6.

5. Voir Dire (hereafter V.D.) at 575.

6. 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976).

to pose questions specifically directed to racial prejudice merely because the victim of the crime and the defendant are of different races or because a crime of violence is involved. However, where racial issues are inextricably bound up with the conduct of the trial and there is a significant likelihood it might affect a defendant's right to a fair trial, inquiry into possible racial prejudice is required in order to assure an impartial jury.[7] Recently, the Court in *Rosales-Lopez v. United States*,[8] a case involving a defendant of Mexican descent, adhered to its holding in *Ristaino* that there is no per se constitutional right to specific voir dire questioning of jurors on racial or ethnic bias or prejudice, such constitutional right being restricted to cases exhibiting "special circumstances," and it is only when in the particular case there is a "likelihood" that such considerations might influence the jury, that inquiry on the subject is required if requested, and if denied may rise to a constitutional violation. Here, whether constitutionally required or not, the record demonstrates that the "wiser course" was adopted and that the court itself initiated inquiry and permitted counsel to question jurors on the subject.[9] What is at issue is whether the court, in exercising its statutory discretion to disallow "statements or questions by either party that are irrelevant to the examination or repetitious"[10] violat-

ed the defendant's federally protected constitutional right to select an impartial jury.

The record shows that when a group of jurors was seated in the jury box, the trial judge gave preliminary instructions concerning their basic functions, duties and conduct as required by New York law.[11] The court also instructed the jury on the nature of the indictment; its lack of evidential value; the presumption of innocence; the burden of proof; and that the guilt or innocence of each defendant was to be decided separately as to him.

In addition, the trial judge noted that the complainant was white; that the defendants were black; that race was not a factor and that the case was to be decided solely on the evidence, and inquired specifically if the jurors could perform that function.[12] Those who indicated inability to comply were forthwith excused.

The court also in its general inquiry of jurors required them to disclose any personal or family experience that might foreclose fair and impartial judgment based solely upon the evidence in the case and in such instances those jurors were questioned separately and out of the presence of other jurors by the court and counsel.

After the court's general inquiry, the prosecution and the defense attorneys questioned jurors individually and collectively.

---

7. *Id.* at 596–98, 96 S.Ct. at 1021–22.

8. —— U.S. ——, 101 S.Ct. 1629, 68 L.Ed.2d 22.

9. *See Ristaino v. Ross*, 424 U.S. 589, 597 n.9, 96 S.Ct. 1017, 1022 n.9, 47 L.Ed.2d 258 (1976).

10. N.Y.Crim.Proc. Law § 270.15(1) (McKinney) in pertinent part provides that "[t]he court must permit both parties, commencing with the people, to examine the prospective jurors, individually or collectively, regarding their qualifications to serve as jurors. The scope of the examination is within the discretion of the court, and the court may disallow statements or questions by either party that are irrelevant to the examination or repetitious."

11. N.Y.Crim.Proc. Law § 270.40 (McKinney).

12. The instruction was repeatedly given as different panels were seated in the jury box. The following is typical:

I am going to tell you now that the complainant in this case is a white woman; the defendants are black.
Is there anything about that, any bias that you may have, searching your heart and souls, that might interfere with your reaching a fair and impartial verdict in this case? Anyone of you? The question is directed to each and everyone. We all have bias and prejudices of some kind. . . . So, if you have any biases of any kind, and particularly racial bias, I want to know about it now. And I assume silence means no.
Race is not a factor in this case. We are dealing with the charges that I will submit for your consideration and you are to determine the guilt or innocence of these defendants. However, should you have such prejudices, they would get in the way of a fair and impartial judgment with regard to the guilt or innocence, and I would not want that to happen. V.D. at 502–03. See also V.D. at 527, 593.

At the outset the court permitted each side unlimited questioning on the subject of racial prejudice. As much is conceded by petitioner.[13] The unrestricted scope of questioning on the subject of racial prejudice continued until the court determined that the interrogation, particularly by Mr. Hill, the attorney who represented petitioner's co-defendant,[14] was repetitive, protracted and irrelevant, and that thereafter the voir dire would be recorded.[15] The court's action was taken after admonition to Mr. Hill that his questions sought to inject into the case civil rights issues that were unrelated to the charges against the defendants, as noted hereafter.

Despite its ruling, the court did not restrict further interrogation of jurors on the issue of racial prejudice. Thereafter and over a period of more than two days the jurors were questioned on the subject by the prosecution and the defense. The prosecutor sought assurance from individual jurors that prejudice would not enter into the case and that questions of race would not be brought up in the jury room and that the verdict would be based solely on the evidence.[16] Defense counsel likewise without restriction inquired on the subject.[17] However, defense went much beyond and sought to question jurors on their views on civil rights. The court again admonished Mr. Hill that although he was given "the widest possible latitude," he continued to interrogate on irrelevant and repetitive matters.[18]

The thrust and unmistakable purpose of Mr. Hill's questioning, which the court found irrelevant and repetitive, was made clear at any early stage of the voir dire by

13. "With regard to the problem of racial prejudice, the trial court initially ruled that the parties could ask any questions they desired on the subject." Brief for Petitioner at 3.

14. The petitioner's counsel on this application states that since Hill, his co-defendant's counsel, questioned the prospective jurors first, his trial counsel apparently relied in large measure on the answers elicited by Hill. Brief for Petitioner at 4.

15. At the close of the *Wade* hearing and before the trial proper started, it was agreed that the voir dire need not be recorded. Wade hearing at 47.

16. The following is typical:
MR. MURPHY [Ass't District Attorney]: Would you promise me if you were a juror in this case you would use your common sense in listening to the testimony?
MS. TERRANOVA: Yes.
MR. MURPHY: Would you promise me that the question of race would not be brought up in the jury?
MS. TERRANOVA: Yes.
MR. MURPHY: Would you promise me if someone else brought it up you would say that's not what we are here to decide, we're here to decide the facts in the case?
MS. TERRANOVA: Yes.
MR. MURPHY: Would you promise me any verdict you render in this case would be based on the evidence alone?
MS. TERRANOVA: Yes.
V.D. at 97–98. See also V.D. at 100, 106–08, 221–22; 533 et passim.

17. MR. HILL [James' counsel]: Ms. Alleyne, have you heard that black people oftentimes, when they find themselves on a jury, will go not with the evidence that they hear, but with the majority opinion ... in an effort to establish that they are not prejudiced in favor of a black defendant? Have you heard that?
MS. ALLEYNE: I haven't really heard that, no.
MR. HILL: Well, let me ask you. Let's assume that you are chosen as a juror on this case. The Court gives its charge and gives the case to the jury to deliberate and you do deliberate. And you find that you are on one side, whatever side it is, all by yourself, would you change your mind to prove that you are not prejudiced in favor of the defendants?
MS. ALLEYNE: No.
MR. HILL: Put it another way. If you sincerely believe in your position, you are not convinced otherwise, would you change your mind?
MS. ALLEYNE: If I was convinced.
MR. HILL: If you were not convinced, would you change your mind?
MS. ALLEYNE: No.
MR. HILL: In other words, Ms. Alleyne, if you are chosen as a juror in this case, would you stand up like a free and independent individual?
MS. ALLEYNE: Yes, I will.
MR. HILL: Mr. Werner, do you know of any reason why you cannot be a fair and impartial juror on this case.
MR. WERNER: No, sir. V.D. at 59; 115; 244; 364 et passim.

18. It is not without interest that petitioner's trial counsel acknowledged that the court had not been unduly restrictive of him in the questioning of jurors. V.D. at 129–30.

his responses to the court's statement that "this is not a civil rights case ... it's a rape and robbery case and I intend to try it as such ... I'm allowing you to question extensively with regard to racial prejudice in spite of *Restaino* [sic]. You are overdoing it." Mr. Hill, however, persisted in his view that "every case is a civil rights case ...."; that from his experience "very, very few cases [do] not have some kind of racial overtone"; that the history of the treatment of the negroes in this country had

relevance in rape and robbery cases and that "for two hundred years black women have been raped in this country day after day and no one does anything about it." The court unsuccessfully continued to remonstrate, stating "you will not tell me this is a civil rights case because it is not. It is a criminal case." Mr. Hill again responded "it's a civil rights case." [19]

▮ Thereafter, as the voir dire continued, and despite the court's admonition, Mr. Hill was persistent in his effort to question

19. The relevant colloquy between court and counsel was as follows:

THE COURT: Okay. Let's get something on the record. Mr. Hill, I want the record to show that the jurors are out of the courtroom. We are alone. I will not permit this sort of voir dire to continue. For a good deal of the time you were doing what Mr. Rhodes quite properly objected to Mr. Murphy doing, which was making statements rather than questioning. Voir dire means you question jurors. A lot of your questioning consisted of statements. A lot of your questioning consisted of repetition, what I have already asked all over again. It's unduly protracted. *Restaino* [sic] against *Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258, is succinct with regard to questioning with regard to race, and it comes after Ham against South Carolina, referred to by Mr. Rhodes. This is not a civil rights case. This is a case—

MR. HILL: Every case is a civil rights case, and let's not forget that.

THE COURT: Mr. Hill, it is not a civil rights case.

MR. HILL: It is a civil rights case.

THE COURT: It's a rape and robbery case, and I intend to try it as such. . . .

. . . . .

THE COURT: ... I am allowing you to question extensively with regard to racial prejudice in spite of Restaino [sic]. You are overdoing it. You are doing it to such an extent that in my opinion it's improper and I want you to cease to the extent of your doing it. I don't want your questions to be repetitious and I don't want them to be irrelevant. A question such as: Is there anything in the study of history which would give a juror a preconceived notion about a rape and robbery on the subway—

MR. HILL: And you don't think there is such a thing as history?

THE COURT: Yes.

MR. HILL: Then we read different history texts, your Honor, and specifically I was referring to the history of this country.

THE COURT: You are right. I don't see the relevance in the history of this country having to do with a rape and robbery case.

MR. HILL: Then, your Honor, I am afraid that we have different concepts of American history.

THE COURT: We are not trying American history.

MR. HILL: I am trying to give the basis. I am talking to a historian who is on this jury.

THE COURT: No, he isn't. He is a prospective juror.

MR. HILL: I said a prospective juror and a historian.

. . . . .

THE COURT: And I tell you now, I am not trying a civil rights case here.

MR. HILL: Your Honor, I think it is time for us to be very fair. I am in court.

THE COURT: You think it's time for the Court to be fair?

MR. HILL: I think sometimes, your Honor, because it's painful we overlook things. As a black person I hate to think, for example, of my experiences in the army. It's too painful to think about sometimes.

. . . . .

MR. HILL: But the fact is that there are very, very few cases, as far as I am concerned, from my experience, that does not have some kind of racial overtone.

THE COURT: Counselor, I said you could go into it. I have given you latitude. You will not tell me this is a civil rights case, because it is not. It is a criminal case.

MR. HILL: It's a criminal case with certain overtones.

THE COURT: The only overtones are that the alleged perpetrators are black, the alleged victim is white. It could very well have been the other way around. The case would be exactly the same.

MR. HILL: The case in point, it would not be here, that is true.

THE COURT: Counselor, I am not interested in your philosophy.

MR. HILL: Then, Judge, we shouldn't talk.

THE COURT: You are saying it would not be in this Court.

MR. HILL: In all probability not, and the record will speak for itself.

V.D. at 15–21.

jurors on extraneous matters, including their views on mixed marriages.[20] Finally, after two and a half days of voir dire questioning by court and counsel and after eleven jurors had been sworn in, the trial judge announced that with respect to a new panel of jurors from which one juror and an alternate were to be selected that counsel would be restricted in questioning the jurors concerning race, and that she herself would interrogate on the subject. The trial judge stated the reasons for her ruling including, but not limited to, Mr. Hill's inquiries as to irrelevant matters.[21] After colloquy, defense counsel stated: "Back to this question of race . . . [i]t's because the minds of Americans are permeated with prejudice and we must do something about it in these courts. We must try to keep it out of the court, and we cannot keep it out by being silent." The court thereupon responded:

> I didn't say we would be silent. I said I would question the jurors with regard to it. . . . I feel asking every black juror whether they would stand up as a black man or black woman and be counted in the jury room is an improper thing to do. I feel that strongly.

> •   •   •   •   •

> [A] trial judge conducting the voir dire may satisfy the defense of due process by generalized, but thoroughly voir diring the panel of prospective jurors. I intend to do that myself.[22]

The subsequent questioning by the court of prospective jurors not only continued to satisfy the doctrine enunciated by *Ristaino v. Ross* and the more recent *Rosales-Lopez v. United States*, but went much beyond its requirement.[23] The questions clearly were probing, direct and sufficiently detailed to require a juror to expose any latent racial hostility.[24] Although in this instance too, the court did state it would take over the questioning of the jurors on the subject of race, both prosecution and defense were permitted to question jurors, but Mr. Hill again sought to inject extraneous issues into the case.[25]

A full and objective reading of the entire voir dire questioning by defense counsel, particularly Mr. Hill, compels the conclusion that his statements and questions were deliberately calculated to inject into the case civil rights issues touching upon the denial to blacks of their economic, social and political rights from the founding of the Republic to the present. His evident purpose was to obtain jurors who would bring into jury deliberation their individual views on civil rights matters based on historical factors and favorable to the defendants because of their race—in a case where the charge was robbery, rape and sodomy and in no respect involved civil rights issues—a case in which there was no claim that the charges were a frame up in retaliation for civil rights activities, such as in *Ham v. South Carolina*.[26]

The trial judge, after this purpose had repeatedly manifested itself, was entirely justified in exercising the discretion vested in her to terminate "irrelevant and repetitive" questioning by counsel.

The voir dire is of significance to assure a fair trial. It is of critical importance to protect a defendant's Sixth Amendment right to a trial free of prejudice. However, the right is not a license to "propound any question" nor does it mean that

> limitless time must be devoted to preliminary voir dire. . . . [T]here are countervailing state interests in the expeditious conduct of criminal trials and the avoidance of jury intimidation. These interests bulk larger as the possibility of un-

20.  *Id.* at 243.

21.  *Id.* at 470, 481.

22.  *Id.* at 481–82.

23.  *Cf. United States v. Grant*, 494 F.2d 120, 122 (2d Cir.), *cert. denied*, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79 (1974) ("It should suffice to ask . . . whether any juror is unable to judge the case fairly because of race, creed or color of defendant.")

24.  See footnote 11, *supra*.

25.  V.D. at 540–41.

26.  409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973).

covering prejudice becomes more attenuated. The trial judge has broad discretion to refuse to ask questions that are irrelevant or vexatious.[27]

Indeed, had the trial judge not exercised her discretion and permitted the injection of extraneous issues, entirely unrelated to the charges against the petitioner, it would have distorted, if not aborted, the essential purpose of the voir dire—to obtain impartial and indifferent jurors. The right to the selection of a fair and impartial jury extends to all parties to a litigation. The state, no less than a defendant, is entitled to have the issues in a case determined by a jury, in the words of Lord Coke as "indifferent as [it] stands unsworn."[28]

The record abundantly establishes that the defense was afforded a fair and full opportunity to question all prospective jurors on the voir dire on the subject of racial prejudice to assure the selection of an impartial jury. The claim that petitioner was denied his right of inquiry on the subject is without substance.

2. The claim that the Trial Court improperly allowed the prosecution's challenge for cause resulting in the exclusion of a black juror on racially discriminatory grounds.

Under New York law, a juror may be challenged for cause if he "has a state of mind that is likely to preclude him from rendering an impartial verdict based upon the evidence adduced at the trial."[29] Willie Thomas, a black juror, upon initial questioning by the prosecutor stated that if accepted as a juror it would definitely be difficult for him to keep the question of race out of his mind during deliberations of the facts, but he would try.[30] The court thereupon, addressing Mr. Thomas, again emphasized what had repeatedly been told the jurors that

> race has nothing whatever to do with this case. . . . Race, sympathy, prejudice, bias have nothing at all to do with this case. And if it's difficult to keep that out of your mind, you [sic] should be apprised of that now and not later. And I appreciate your frankness in saying, Mr. Thomas, that it would be difficult for you to keep it out of your mind.[31]

The court asked the juror to explain why he would find it difficult to rule out the question of race, to which he responded:

> MR. THOMAS: Because based on the fact I think of the lawyers sitting over there had said a lot of times people are going to jail in this society because, you know, I'm not naive, because they hadn't done anything and I'm not going to sit here and think race had nothing to do with that, so based on that fact I consider, and I still am considering and will consider race in a—not above the facts, because the facts come first—
>
> THE COURT: But second, you would consider race second?
>
> MR. THOMAS: Not second, I would say second, third or fourth, but based on the history of events, based on the past.
>
> THE COURT: It would be part of your consideration in this case?
>
> MR. THOMAS: It would have to be.
>
> THE COURT: Thank you very much. And I appreciate your frankness. Proceed, Mr. Hill.[32]

It can hardly be disputed that the juror's statements of his attitude could foreclose consideration of guilt or innocence based solely upon the evidence presented at the

---

27. *Ham v. South Carolina,* 409 U.S. 524, 533, 93 S.Ct. 848, 853, 35 L.Ed.2d 46 (1973) (Marshall, J., concurring in part and dissenting in part).

28. *Cf. Ristaino v. Ross,* 424 U.S. 589, 596, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *Snyder v. Massachusetts,* 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934) (Cardozo, J.) ("But justice, though due to the accused, is due to the accuser also"); *see*

*also* N.Y.Crim.Proc. Law § 270.15(2) (McKinney).

29. N.Y.Crim.Proc. Law § 270.20(1)(b) (McKinney).

30. V.D. at 313.

31. *Id.* at 314.

32. *Id.* at 321–22.

trial. In subsequent questioning of the juror by petitioner's counsel as to whether he thought he could "listen to the evidence and render a decision, an objective decision based on the testimony [he heard] from this witness stand," he responded, "Yes, I do."[33] Petitioner urges that since the juror's response was an expurgatory oath, he was not subject to challenge for cause and that it was constitutional error to sustain the prosecution's challenge.

■ The expurgatory oath is not contained in the present statute but is derived from the former New York Code of Criminal Procedure § 376 governing challenges for cause. That statute, in the instance of actual bias which was there defined as "the existence of a state of mind on the part of the juror" such that he "cannot try the issue impartially and without prejudice to the substantial rights of the party challenging," authorized a challenge for cause but permitted the disqualification of the juror to be removed if he "declared on oath *to the satisfaction of the court* that his opinions would not influence his verdict, and that he could render an impartial verdict according to the evidence."[34] While the expurgatory oath is not contained in the present statute, it appears that it is still available to remove the taint of disqualification where a challenge for cause exists based upon a juror's "state of mind that is likely to preclude him from rendering an impartial verdict based

on the evidence produced at the trial." The availability of the expurgatory oath is dependent upon the facts and circumstances of each particular case.[35]

However, it is not without interest to note that with respect to the current statute, the New York Court of Appeals has observed "the talismatic [sic] expurgatory oath has been abandoned, so that there is no longer any facile method for purging a prima facie showing of bias. . . . In sum the new law gives the Trial Judge greater flexibility and a greater responsibility in determining which veniremen should be excused for cause."[36] In any event, assuming the continued viability of the expurgatory oath, the trial judge determines "[a]ll issues of fact or law arising on the challenge."[37] The fact issue encompasses implied as well as actual or openly expressed attitudes that are likely, whether deliberately or subconsciously to bring into play bias or prejudice and thus intrude upon a juror's fair and impartial consideration of the evidence. The "impartiality [of a juror] is not a technical concept. It is a state of mind."[38] The state of one's mind requires a fact determination as does the state of one's digestion.[39] This determination involves an evaluation of a variety of factors and all the surrounding circumstances and the fair inferences to be drawn therefrom.[40] The trial judge was not bound to accept at face

**33.** *Id.* at 324.

**34.** *People v. Branch*, 46 N.Y.2d 645, 650, 415 N.Y.S.2d 985, 389 N.E.2d 467 (1979) (emphasis supplied); *see People v. Biondo*, 41 N.Y.2d 483, 484, 393 N.Y.S.2d 944, 362 N.E.2d 576, *cert. denied*, 434 U.S. 928, 98 S.Ct. 413, 54 L.Ed.2d 288 (1977); Former Code Crim.Proc. § 376(2).

**35.** *Compare People v. Branch*, 46 N.Y.2d, *supra*, at 469, 415 N.Y.S.2d 985, 389 N.E.2d 467 (expurgatory oath unavailable where juror, a part-time police officer, has professional and personal relationship with the state's trial attorney) *with People v. Provenzano*, 50 N.Y.2d 420, 424, 429 N.Y.S.2d 562, 407 N.E.2d 408 (1980) (expurgatory oath available where juror campaigned for the prosecutor for his election as County District Attorney but her efforts were for the party's ticket, on which the prosecutor ran, rather than a personal effort for him alone).

**36.** *People v. Culhane*, 33 N.Y.2d 90, 104 n.2, 350 N.Y.S.2d 381, 305 N.E.2d 469 (1973).

**37.** N.Y.Crim.Proc. Law § 270.20(2) (McKinney).

**38.** *United States v. Wood*, 299 U.S. 123, 145–46, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936).

**39.** *Siegelman v. Cunard White Star*, 221 F.2d 189, 198 (2d Cir. 1955).

**40.** *Bon-R Reproductions, Inc. v. National Labor Relations Board*, 309 F.2d 898, 909–10 (2d Cir. 1962) (Friendly, J., concurring and dissenting) ("Although 'the state of a man's mind is as much a fact as the state of his digestion,' *Edgington v. Fitzmaurice* (1885), 29 Ch.D. 459, 483, we have not yet developed mental X-rays permitting this 'fact' to be determined by direct observation rather than by inference.")

value the juror's expurgatory statement. Also to be considered was the juror's earlier responses that definitely it would be difficult to keep the question of race out of his mind during jury deliberation and that innocent persons are jailed and that he did not "think race had nothing to do with that." The juror's manner, his intonations, his gestures, behavior and the like—in short, his demeanor, not apparent from the dry stenographic record, may by itself have impeached him,[41] created doubts as to his sincerity[42] or, as so aptly phrased in the widely-quoted observation by our revered Chief Judge Learned Hand, the trier of fact may be satisfied "not only that the witness' testimony is not true, but that the truth is the opposite of his story."[43] The Supreme Court has observed that in the conduct of the voir dire, much is left to the court's discretion because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge"[44] and that

> [t]he trial judge's function at [the voir dire] is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. [citations omitted] In neither instance can an appellate court easily second-guess the conclusions of the decision-maker who heard and observed the witnesses.[45]

Here the court, in upholding the challenge for cause, based upon the totality of the juror's responses found that "race would be a factor which he would consider."[46] There is nothing in this record to impugn the integrity of the court's finding that by reason thereof the juror was precluded from rendering an impartial verdict based upon the evidence in the case and so was challengable for cause.

3. The claim that the prosecutor's conduct during trial and in summation violated defendant's due process right to the presumption of innocence and the placement of the burden of proof.

This claim is based upon three separate incidents. First, it is contended that the prosecutor's opening statement to the jury that a grand jury had voted the indictment "after hearing legally admissible evidence," suggested that the grand jurors had heard reliable evidence and had already passed on petitioner's guilt and that the jury was encouraged to draw some significance from this prior determination. Next, that the prosecutor in responding to petitioner's arguments for a separate verdict improperly stated that the two defendants were being tried together because they had committed the crime together, and finally, that the prosecutor in his summation suggested that an inference unfavorable to petitioner should somehow be drawn from defense counsel's failure to cross-examine a witness who had identified the co-defendant. In sum, petitioner contends that thereby his right to due process was denied.

(a) The contention based upon the reference to the grand jury's return of an indictment "after hearing legally admissible evidence" readily dissolves when viewed against the reiterated references during the voir dire by the court and counsel for the prosecution and defense in their opening statements and summations, that the indictment was merely an accusation, a charge, "a scrap of paper" and of no probative value.

The court in its final instruction to the jury again underscored that "[a]n indictment is merely a legal form by which a

---

41. *See Broadcast Music, Inc. v. Havana Madrid Restaurant Corp.*, 175 F.2d 77, 80 (2d Cir. 1949).

42. *Quock Ting v. United States*, 140 U.S. 417, 420, 11 S.Ct. 733, 734, 35 L.Ed. 501 (1891).

43. *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952).

44. *Ristaino v. Ross*, 424 U.S. 589, 595, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976).

45. *Rosales-Lopez v. United States*, —— U.S. ——, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1981).

46. V.D. at 346.

crime is charged. It is nothing more than an accusation and it has no evidentiary or probative value whatever. It is neither evidence of anything nor does it prove anything."[47] In the light of such repeated references, with which the record is studded, the claim that the prosecutor's statement impinged upon defendant's right to a fair trial is without substance.

■ (b) Similarly, the claim that the prosecutor's reference to the defendants being tried together does not rise to constitutional due process taint. The claim is based upon the following:

> What about the Defendant St. Lawrence with his appeal for a separate verdict? These defendants are being tried together because they decided on January 27, 1977—
>
> MR. RHODES: Objection.
>
> MR. MURPHY: —to act together.
>
> THE COURT: I will instruct you with regard to why these defendants are being tried together. However, it is alleged that they have acted in concert together in the commission of the crimes charged.[48]

The prosecutor's statement was a legitimate attempt to respond to petitioner's counsel's basic position throughout the entire trial where he properly sought to keep petitioner's defense entirely separate and distinct from that of the co-defendant James against whom the evidence appeared to be weightier. Thus, again petitioner's claim must be considered in the light of events at the trial. Commencing with the voir dire, petitioner's counsel stressed that his client's case was separate from and was to be considered independently from that of the co-defendant. Each and every juror was questioned by petitioner's counsel on the voir dire substantially as follows:

> MR. RHODES [Petitioner's counsel]: Do you promise me you are going to give me a separate trial toward Alvin Saint

Lawrence.... Will you give me a verdict for Alvin Saint Lawrence as an individual and apart from the verdict you will render on Joel Lee James the co-defendant? ... Assuming that to be the law, would you be able to follow the instructions of the Judge when she tells you that these are individuals? ... And all of you agree with that? That these are two separate people on trial? You may find one guilty and one innocent, or both guilty, but you will give Alvin Saint Lawrence a separate trial?[49]

And the court in its final instruction to the jury restated prior instructions on the subject:

> [N]othing may be inferred from the fact that there is a joint trial. Each crime charged and the evidence applicable to that crime, if any, must be considered separately as to each defendant. The fact that you may find one defendant or not guilty of one of the crimes submitted to you should not control your verdict with respect to the other defendant.
>
> It is your sworn duty to give separate, personal consideration of the case to each individual defendant.[50]

Under all the circumstances, the claim that the prosecutor's statement that the defendants were "being tried together" because they decided "to act together" reached the level of constitutional error and violated his right to a fair trial is sheer rhetoric. Indeed, the statement does not appear improper when viewed, not in isolation, but in the context of the totality of trial events.[51]

(c) Finally, petitioner contends that a rhetorical question by the prosecutor in his summation as to the failure of petitioner's counsel to cross-examine a witness was of such an egregious nature that petitioner's right to a fair trial was violated. The incident relied upon is as follows:

> MR. MURPHY: Did Mr. Rhodes ask him any questions? Was Mr. Hart [the

---

**47.** Trial Record (hereafter T.R.) at 405.

**48.** *Id.* at 396.

**49.** V.D. at 66–67, 79, 151 et passim.

**50.** T.R. at 417.

**51.** *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974).

conductor on the train] asked any questions—

MR. RHODES: Objection.

MR. MURPHY: In relation to the Defendant Alvin St. Lawrence—

MR. RHODES: Objection.

THE COURT: It is the jury's recollection that—

MR. RHODES: I move for the withdrawal of a juror.

THE COURT: Denied.[52]

The interrogatory must be considered in its relationship to the summation by petitioner's counsel.[53] The conductor of the train on which the assault had occurred had identified petitioner's co-defendant James as one of the two men in the car with the complainant and that it was James who had threatened him with a knife.[54] James' counsel on cross-examination asked, over objection of petitioner's counsel,[55] whether a third person was present and the witness responded affirmatively and repeated this on redirect by the prosecutor but did not identify the third person.[56]

Petitioner here contends that the prosecutor's rhetorical question during his summation tended to undermine the presumption of innocence, to shift the burden of proof to petitioner, and suggested that there was further evidence of petitioner's guilt that had not been adduced. This contention magnifies a trial incident far beyond any significant impact it might have had on the jury. Summations cannot be considered in a vacuum; they must be evaluated against the actualities of the living trial.[57] Petitioner's counsel, and very properly so, had stressed the fact that the conductor had not identified his client. How-

ever, he was aware that the conductor, who had not been questioned as to the identity of the third person he said was in the car, had told the prosecutor after he left the witness stand that he "recognized the other fellow [petitioner] who was inside that subway train," and that the reason he had not identified him while on the witness stand was because "no one asked" him.[58] When the prosecutor sought to recall the conductor to offer this testimony, petitioner's trial counsel "strenuously" objected and the court sustained the objection. While the prosecutor's interrogatory about the non-cross-examination of the conductor may have been provoked by what he considered an unfair argument by petitioner's counsel in the light of the attempt to recall the conductor, nonetheless, it should not have been made since upon the record there had been no identification of the petitioner by the conductor, and hence no need or reason to cross-examine him—indeed, to have done so most likely would have brought forth an answer adverse to petitioner. However, it does not follow that the challenged remark was so prejudicial that it infringed upon petitioner's constitutional right so that he was deprived of a fair trial. "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'"[59] The contention that the interrogatory was of such magnitude that it deprived petitioner of the presumption of innocence and shifted the burden of proof utterly disregards the oft-repeated instruction to the jury of the presumption of innocence and that the defendants not only had no burden of proof but

52. T.R. at 385.

53. *People v. Marks*, 6 N.Y.2d 67, 77, 188 N.Y. S.2d 465, 160 N.E.2d 26, (1959), *cert. denied*, 362 U.S. 912, 80 S.Ct. 662, 4 L.Ed.2d 620 (1960).

54. T.R. at 168.

55. *Id.* at 176.

56. *Id.* at 192.

57. "[T]he perspective of the living trial is lost in the search for error in a dead record." *Glasser v. United States*, 315 U.S. 60, 88, 62 S.Ct. 457, 473, 86 L.Ed. 680 (1942) (Frankfurter, J., concurring in part and dissenting in part).

58. T.R. at 206–07.

59. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1973) *quoting Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941).

that the burden of proof was upon the prosecution. Additionally, the effect of the remark was dissipated by a specific disapproving instruction given immediately before the jury entered upon it deliberations. The very last instruction was "[a]n attorney is not required when defending a criminal case to cross-examine a witness or to do anything else and no inference is to be drawn from his failure to do so."[60] Under all the circumstances, the interrogatory was denuded of prejudicial impact, if any. It is a long leap from that interrogatory to an inference unfavorable to petitioner so that, as petitioner argues, the burden of proof had shifted and the presumption of innocence had been removed. That contention presumes the jury disregarded the court's instructions. The presumption is that the jury did follow the instructions.[61] In sum, whether considered singly or cumulatively, the alleged matters referred to did not undermine the presumption of innocence or shift the burden of proof to petitioner and did not deprive him of his right to a fundamentally fair trial.

██ Finally, even if it were assumed that the claims here advanced constituted error, a study of the entire record compels the conclusion they were harmless. In such event, the Court finds beyond a reasonable doubt that the incidents relied upon either singly or in combination were harmless and did not deprive petitioner of his right to due process of law.[62]

The petition for a writ of habeas corpus is dismissed upon the merits.

So ordered.

---

**60.** T.R. at 462.

**61.** *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 367, 83 S.Ct. 448, 463, 9 L.Ed.2d 357 (1963); *United States v. DeLillo*, 620 F.2d 939, 947 (2d Cir. 1980).

**62.** *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).