[No. F014489. Fifth Dist. Sept. 25, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
LEMUEL B. CHANEY, SR., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Lisa Lewis Dubois, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

FRANSON, J.*—Defendant Lemuel B. Chaney, Sr., appeals from the judgment entered on the jury verdict convicting him of possession for sale of rock cocaine (Health & Saf. Code, § 11351.5) and manufacture of a controlled substance (Health & Saf. Code, § 11379.6, subd. (a)). Defendant makes several contentions for reversal of the judgment, all of which we reject.

STATEMENT OF FACTS

On March 13, 1990, about 7 a.m., Bakersfield Police Officer Lyle Martin, who was assigned to narcotics detail, along with several other officers, executed a search warrant at 1809 Lacey Street, Apartment 10. The officers found defendant lying on the living room couch. A second individual, 17-year-old Roy Brooks, was in the east bedroom.

A search of the two-bedroom apartment turned up an Ohaus brand triple beam scale in a kitchen cabinet along with two boxes of baking soda and some jars with a white residue inside. Nothing else was in the cabinet and most of the other cabinets were bare. In the east bedroom where Brooks was found, officers seized a pair of handcuffs, a Rolex watch, an MCI card, a plastic test tube, a measuring spoon, a Casio quick-dialing telephone dialer and two firearms. The officers also found a chunky white substance, later determined to be cocaine base, wrapped in plastic in a brown tennis shoe found next to the bed. The shoe was not seized nor photographed. Although the shoe was at least a size 11, and defendant was a larger man than Brooks, the officer who found the cocaine in the shoe admitted that the shoe could have fit Brooks.

In the living room the officers found $659 in currency under a couch cushion. The money consisted of twenty-two $20 bills, one $10 bill, one $100 bill, two $50 bills and some $1 bills. Officer Martin testified that dealers commonly sell rock cocaine in $20 amounts. After being advised of his *Miranda* rights, defendant admitted the money under the cushion was his and that he had not worked for about a month. Officer Miller asked defendant how he provided for himself. He replied that he had been supplementing his income by selling rock cocaine.

A search of Brooks disclosed a baggie containing about 1.2 grams of cocaine base, $220 in cash and less than an ounce of marijuana. Officers

---

*Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.

found a wallet containing two $20 bills, a driver's license and a security badge on defendant's person.

Officer Martin testified that in his expert opinion, based on the items recovered—the triple beam scale, baking soda, jars with white residue and the test tube—cocaine base was being manufactured at the apartment. He further testified that taking into account the denominations of money found, the scales, the jars, the packaging materials and the fact that a firearm was at the residence, the cocaine base was being held for sale. The presence of the telephone dialer, a device frequently used by individuals who traffic drugs, contributed to this conclusion.

Narcotics expert, Officer Heiduk, also testified that the presence of the cocaine, baking soda, scale, glass jars with a white powdery residue, firearms and the amounts of currency found indicated that the people in the apartment were involved in the manufacture and distribution of rock cocaine. In addition, the fact that no pipe or other device for ingesting cocaine was found, coupled with the fact that neither resident was under the influence when arrested, indicated that the cocaine found was possessed for sale rather than for personal use.

### DEFENSE

Defendant testified that he smoked marijuana occasionally but used no other drugs. He had the scale to measure the marijuana to make sure he was getting what he paid for. Of the $659 found, $649 was his from his last job as a security guard and bouncer. The remainder belonged to Brooks. Defendant was a friend of Brooks's mother. Brooks had been staying with him for four days in the east bedroom while defendant slept on the couch. The brown tennis shoe belonged to Brooks.

Defendant explained he used the baking soda as a deodorizer and to brush his teeth. The white residue in the jars was soap powder. Finally, defendant testified that when Officer Martin asked him if he was selling rock cocaine to supplement his income, he had replied sarcastically, "Yeah, right."

### DISCUSSION

I. *The trial court did not abuse its discretion by denying defense counsel's request to voir dire prospective jurors on racial bias.*

Proposition 115, the "Crime Victims Justice Reform Act," changed California criminal law in several respects. One provision added section 223 to

the Code of Civil Procedure[1] (and repealed former §§ 223 and 223.5) to provide that in criminal cases, the court shall conduct voir dire examination of prospective jurors but the parties may conduct further examination on a showing of good cause. Defendant concedes that the trial court correctly held that Proposition 115's voir dire provisions applied in his case. (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 299, 300 [279 Cal.Rptr. 592, 807 P.2d 434].) He contends, however, in applying those provisions, the trial court deprived him of his right to an impartial jury. Specifically, the court failed to make adequate inquiry into the attitudes of the jurors regarding racial bias and narcotic offenses where defendant, an African-American, faced trial on a drug charge in a predominately White community.

Section 223 provides:

"In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper . . . .

"Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause.

"The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

*Defendant's "Good Cause" Showing*

Defense counsel filed a motion *in limine* requesting attorney voir dire of prospective jurors as to racial bias and attitudes toward drug use and trafficking. The motion was made on the ground that defendant, an African-American, was to be tried in a predominately White community where "racist bias is common." Counsel feared that defendant, who had no prior record, could be convicted based on a general bias that drug trafficking is associated with African-Americans. Counsel contended the commonly asked voir dire question addressing racial bias, "Can you be fair to my client who is a black man," required only a yes or no answer and suggested a socially appropriate response. Further, counsel opined that some jurors are not conscious of their biases or are reluctant to admit to racial prejudice in the presence of others. She proposed a list of 16 open-ended questions which she

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise indicated.

believed more accurately tested for racial bias.[2] The court rejected counsel's contention that racial bias was common in the community and denied the motion, finding no good cause at that time for voir dire by counsel.

The court conducted voir dire. The trial judge asked each prospective juror individually whether he or she could be fair and impartial. In response, two members of the venire asked to discuss issues privately regarding their concerns—none of them racially based—about impartiality. In addition, the court asked the panel as a whole, "It may appear that one or more of the parties, attorneys or witnesses come from a particular national, racial or religious group or may have a lifestyle different from your own. Would this in any way affect your judgment or the weight and credibility that you would give to the evidence?"[3] No juror gave a positive response. The court then recessed and permitted counsel to present additional arguments directed at good cause for further questioning of the prospective jurors.

Defense counsel pointed out there were no Black persons on the jury panel, but had nothing else to add to the good cause showing she made before the court conducted voir dire. The court again denied the motion. Counsel then exercised their peremptory challenges. At a recess, defense

---

[2]"QUESTIONS FOR PROSPECTIVE JURORS

"Some people feel that racial discrimination is a thing of the past. How do you feel about this issue?

"In the course of a typical week of your life, do you usually have any contact with any Black people? What is the nature of those contacts?

"What is the racial background of

"—People you work with?

"—Your [neighbors]?

"—People that you socialize with?

"Are there any famous Black people that you admire?

"If so, who?

"What is it that you admire about each of these people that you have named?

"How do you feel about interracial dating? About interracial marriage?

"Do you have any feelings about Black people, generally? What are those feelings?

"Do you think Black people are more likely than others to be involved in drug trafficking?

"If your answer to the previous question was yes, why do you think that this is so?

"Do you have any thoughts as to why we do not have any more Black judges, lawmakers, mayors, politicians, Presidents (none), Congressmen, etc., than we do, in this community, and in this country?

"Do you think that Bakersfield and the County of Kern needs a Human Relations Commission?

"Why or why not?"

[3]The question asked by the court is included in section 8.5, paragraph (b)(18) of the California Standards of Judicial Administration, which sets out a script for the examination of prospective jurors in criminal cases. (Cal. Rules of Court, Appen., Div. 1.) Section 8.5 is one of several revised Rules of Court and Standards of Judicial Administration which were prepared by the Judicial Council in anticipation of the passage of Proposition 115.

counsel reiterated that she did not know anything about the racial attitudes of the prospective jurors based on the court's voir dire and renewed her request for further inquiry in the area of racial bias. The court denied the request on three grounds.

First, the court did not find the proposed questions probative of racial prejudice. Second, counsel had not provided good cause for further questioning, and third, although the defendant was Black, so was Officer Martin, the prosecution's chief witness, and another prosecution witness, Officer Wilson. The court concluded, "if there are black people up there and they don't like blacks, your theory is going to run to both sides."

The specific questions before this court are (1) whether the voir dire conducted by the court was constitutionally sufficient and, if so, (2) whether the court erred nonetheless in concluding defendant did not show "good cause" for further inquiry on racial bias.

### Constitutional Sufficiency of Voir Dire for Racial Bias

■ "The purpose of *voir dire* examination is to safeguard the right to jury trial which 'guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors.' The requirement of impartiality demands that voir dire examination serve as a filter capable of screening out prospective jurors who are unable to lay aside any opinion as to guilt or innocence and render a verdict based on the evidence presented in court." (*United States v. Liddy* (D.C.Cir. 1974) 509 F.2d 428, 434 [166 App.D.C. 95], fns. omitted.)

Thus, at a minimum, information must be extracted from the jurors in order to assess whether they are in fact fair and impartial. Under the new statutory provisions, voir dire may only be conducted in aid of the exercise of challenges for cause, not for peremptory challenges. (§ 223.) A juror may be challenged for cause for one of the following:

"(A) General disqualification—that the juror is disqualified from serving in the action on trial.

"(B) Implied bias—as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror.

"(C) Actual bias—the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (§ 225, subd. (b)(1).) Implied bias is found

when there is "[t]he existence of a state of mind in the juror evincing enmity against, or bias towards, either party." (§ 229, subd. (f).)

■ Defendant sought to question the jurors more specifically to ascertain if any harbored implied or actual bias because of racial prejudice. ■ The United States Supreme Court has addressed the scope of voir dire constitutionally compelled to uncover racial bias on several occasions. As a general rule, the trial court is given wide latitude to determine how best to conduct the voir dire in such cases. (*Rosales-Lopez* v. *United States* (1981) 451 U.S. 182, 189 [68 L.Ed.2d 22, 29, 101 S.Ct. 1629].) Failure to ask specific questions is reversed only for abuse of discretion. Abuse of discretion is found if the questioning is not reasonably sufficient to test the jury for bias or partiality. (*United States* v. *Jones* (9th Cir. 1983) 722 F.2d 528, 529.) The trial court may refuse voir dire questioning which is tied to prejudice only speculatively. (*Ibid.*)

In *Ham* v. *South Carolina* (1973) 409 U.S. 524 [35 L.Ed.2d 46, 93 S.Ct. 848], the court held that there may be circumstances present in some cases "in which an impermissible threat to the fair trial guaranteed by due process is posed by a trial court's refusal to question prospective jurors specifically about racial prejudice during voir dire." (*Ristaino* v. *Ross* (1976) 424 U.S. 589, 595 [47 L.Ed.2d 258, 96 S.Ct. 1017].) *Ham* involved a young Black man known in his hometown as a civil rights activist, who was arrested for possession of marijuana. His defense was that law enforcement officers had framed him on the narcotics charge to "get him" for those activities. His counsel unsuccessfully sought to have the court ask: " '1. Would you fairly try this case on the basis of the evidence and disregarding the defendant's race' " and " '2. You have no prejudice against negroes? Against black people? You would not be influenced by the use of the term "black"?' " (409 U.S. at p. 525, fn. 2 [35 L.Ed.2d at p. 49].) The trial judge denied the request and asked instead, " '1. Have you formed or expressed any opinion as to the guilt or innocence of the defendant, Gene Ham? 2. Are you conscious of any bias or prejudice for or against him? 3. Can you give the State and the defendant a fair and impartial trial?' " (*Id.* at p. 526, fn. 3 [35 L.Ed.2d at pp. 49-50].) The Supreme Court held that the judge should have interrogated the jurors about racial prejudice, though he was not required to put the question in any particular form or ask any particular number of questions on the subject. (*Id.* at p. 527 [35 L.Ed.2d at p. 50].)

In a subsequent case, however, the court stressed that *Ham* did not announce a requirement of universal applicability. "Rather, it reflected an assessment of whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as [they stand] unsworne.'

[Citation.]" (*Ristaino* v. *Ross, supra,* 424 U.S. at p. 596 [47 L.Ed.2d at p. 264].) The special circumstances in *Ham* strongly suggested the need for voir dire to include specific questioning about racial prejudice. Ham's prominence in the community as a civil rights activist, if not already known to the veniremen, would have been revealed when he presented his defense. Further, Ham's reputation as a civil rights activist and the defense he interposed were likely to intensify any prejudice that individual members of the jury might harbor. Racial issues therefore were "inextricably bound up with the conduct of the trial." (*Ristaino, supra,* at p. 597 [47 L.Ed.2d at p. 264].)

Such special circumstances were not present in *Ristaino.* The mere fact that the victim of the alleged crime was a White man and the defendants were African-Americans did not suggest a significant likelihood that racial prejudice might infect Ristaino's trial. Thus, the demands of due process could be satisfied by the court's more generalized inquiry into the impartiality of the jurors. (*Ristaino* v. *Ross, supra,* 424 U.S. at p. 598 [47 L.Ed.2d at p. 265].) The court noted, however, although questioning directed to racial prejudice is not constitutionally required in all cases where race is an issue, "the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant." (*Id.* at p. 597, fn. 9 [47 L.Ed.2d at p. 265].)

 Under *Ristaino,* the court's voir dire on the issue of racial bias in the present case was constitutionally sufficient. First, defendant did not demonstrate any "special circumstances" necessitating a more specific inquiry regarding racial prejudice. The fact that defendant is an African-American being tried in a "predominately white community," without more, does not constitute a special circumstance necessitating more specific voir dire inquiry. In our heterogeneous society, policy as well as constitutional considerations militate against an *assumption* that justice in a court of law may turn upon the pigmentation of skin. (*Ristaino* v. *Ross, supra,* 424 U.S. at p. 596, fn 8 [47 L.Ed.2d at p. 264].) Second, defense counsel presented no evidence to support her hypothesis that Caucasians generally associate African-Americans with drug use and drug trafficking. Therefore, there was no showing that racial issues were "inextricably bound up with the conduct of the trial." (*Id.* at p. 597 [47 L.Ed.2d at p. 264].) Third, the court did voir dire in the area of racial prejudice. Both *Ham* and *Ristaino* approved a generalized inquiry as to racial prejudice similar to questions asked in this case. (*Ham* v. *South Carolina, supra,* 409 U.S. at p. 527 [35 L.Ed.2d at p. 50]— either of the general questions were sufficient to focus the attention of the prospective jurors on any racial prejudice they might entertain; *Ristaino* v. *Ross, supra,* 424 U.S. at pp. 594-595 [47 L.Ed.2d at pp. 262-264]—the demands of due process were satisfied by the court's generalized inquiry,

" 'If any of you . . . is sensible of any bias or prejudice, you should make it known to the court at this time.' " (*Ristaino* at pp. 592, fn. 3, 598 [47 L.Ed.2d at pp. 262, 265].) Accordingly, defendant was not denied his constitutional right to an impartial jury by the court's general inquiry regarding racial prejudice in this case.

### *"Good Cause" for Further Inquiry on Racial Bias*

■ In the same vein, defendant did not demonstrate "good cause," within the meaning of section 223, to supplement the voir dire in aid of exercising challenges for racial bias. In making the determination of good cause for counsel to supplement the court's examination of the prospective jurors, the court considers "all relevant matters which may lead to a significant possibility of bias because of the nature of the case or its participants." (Cal. Standards Jud. Admin., § 8.7 [Deering's Cal. Ann. Codes, Rules (Appen.) (1991 pocket supp.) p. 202].)

Section 8.7's "matters which may lead to a significant possibility of bias" language appears to be the equivalent of the *Ham* and *Ristaino* courts' special-circumstances standard. Thus, by analogy, "good cause" under section 223 requires more than an unsupported contention that the members of the venire harbor racial prejudice against a minority defendant. This is especially true where, as here, racial issues are not "inextricably bound up with the conduct of the trial." (*Ristaino* v. *Ross, supra,* 424 U.S. at p. 597 [47 L.Ed.2d at p. 264].) The fact that defendant is African-American had no bearing on the underlying charges or on the defense offered. Moreover, as the trial judge pointed out, if a juror were inclined to discount the credibility of an African-American, that tendency would have operated against both the prosecution and the defense in this case. Thus, the court did not err in concluding that defendant had failed to provide good cause for supplemental voir dire.

### II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 853.

## Disposition

The judgment is affirmed.

Martin, Acting P. J., and Harris, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 19, 1991. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.