Filed 9/30/15  P. v. Riley CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JONATHAN RILEY,<br><br>　　　Defendant and Appellant. | B254244<br><br>(Los Angeles County<br>Super. Ct. No. TA127650) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Pamela J. Voich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Defendant and appellant Jonathan Riley raises sufficiency of the evidence and jury instruction issues following his conviction of possession of cocaine base, and possession for sale of phencyclidine (PCP), with an enhancement for a prior drug-related conviction.

For the reasons discussed below, the judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa*, (1993) 6 Cal.4th 1199, 1206), we find the evidence established the following.

1. *Prosecution evidence.*

   a. *The informant's drug buy.*

On April 2, 2013, at about 8:00 p.m., a narcotics team from the Los Angeles Police Department was investigating a house located at 323 West 89th Street. Officer Melissa Gonzalez and her partner set up a controlled drug buy in which they gave a recording device to their female informant, Sandy Charles, provided her with a pre-marked twenty dollar bill, and sent her to the subject house to purchase narcotics. The officers parked on the other side of the street from the house. Charles approached the front door of the house after going through a gate on the side of the house. From their vantage point, Gonzalez and her team were not able to see any of the drug transactions that transpired.

Charles testified she walked up to a porch where the front door of the house was located. Although there were windows on either side of the front door, Charles could not see into the house. It was dark outside, but there was a porch light illuminating the porch and the front door area.

When Charles first arrived, there was a black man on his knees in front of a porch window, through which a drug transaction apparently was taking place. Charles was standing about five feet behind the man and had a clear view of the window. After putting the small vial of what Charles believed to be PCP into his sock, the man, talking to someone through the window, asked to buy some marijuana. Charles testified that, in apparent response to this request, she heard both male and female voices coming from inside the house. She saw the man (hereafter sometimes referred to as the "marijuana

2

customer") hand $20 through the window to someone inside. Charles testified she saw a man's hand take this money: "[The marijuana customer] put the money through the window and it's a guy that took the money." Asked why she reached this conclusion, Charles testified, "I know a man's hand from a female's hand. It was a male's hand. As best I can see it was a guy's hand."

After several minutes, the customer began to get agitated because he hadn't been given his marijuana. He said to the people inside the house, "Where the cush [i.e., marijuana] at? [¶] Where the cush at[?]" Charles initially testified that she heard a man's voice from inside the house respond by telling the marijuana customer to be patient. However, in later testimony, Charles acknowledged that this was wrong: the voice telling the marijuana customer to be patient was a woman saying something like "Hold on. I'm getting your stuff." Nevertheless, Charles insisted she had heard both male and female voices while the marijuana customer was making his purchase:

"Q. . . . Now, as this customer was asking 'Where's the cush, where's the cush,' did you hear any voices from inside the house at that point?

"A. Yes.

"Q. Tell us about the voice you heard from inside the house when the customer asked 'Where is the cush?'

"A. There was a guy and girl that were talking.

"Q. Okay.

"A. 'Hold on['] – some kind of conversation. I don't know what they were saying, but –

"Q. All right. So when this customer was asking 'Where's the cush, where's the cush,' after he had waited for a while and became a little agitated, you heard a man's voice again from inside the house; is that right?

"A. Yes."

Charles testified that, after hearing these voices, she saw a man's hand reappear from inside the house – through the window – and drop a bag of what appeared to be marijuana into the customer's hand.

3

Charles also testified that while this marijuana transaction was taking place, a young black man came to the porch, knocked on the front door, and requested entry so he could retrieve his coat. A woman, whom Charles subsequently identified as Trayesha Foster, opened the front door and let this man inside. Foster then came out onto the porch and asked Charles what she wanted. Charles asked for $20 worth of cocaine and handed Foster the marked bill. Foster went inside and subsequently handed Charles her cocaine through the window.

b. *The police search of the drug house.*

Charles left the house and met up with the surveillance team. After retrieving the cocaine from Charles, the officers called the search warrant team, which was in route, to notify them that the informant had made a good buy. Officer Gonzalez estimated that approximately half an hour had elapsed between the time Charles was dropped off to make the buy and when the search team arrived.

Los Angeles Police Department Officer Darren Stauffer was a member of the search team that responded to the scene. The front entrance to the house consisted of two doors: a black metal security door on the outside of an inner wooden door. The security door was a type of screen door with metal mesh so that the inner door could be seen through it. Stauffer testified a search team can usually get into a house within ten seconds, but that the entrance to this house was so heavily fortified it took three or four minutes to gain entry. The security door had extra sheet metal attached and there were lag bolts "running outwards and into the doorframe which added more reinforcement." As a result, the team only managed to gain entry by literally destroying the front door. Referring to a photograph taken at the scene, Stauffer explained: "[Y]ou can see where the stucco had to be pried out and actually removed as we ripped the whole [door] frame out of the house itself." Other parts of the house had also been especially fortified: Stauffer testified that, in addition to the typical window bars found in this neighborhood, these windows had steel bars and "a sheet metal plate . . . welded . . . to the outside of the bars themselves."

4

Detective John Armando, another member of the search team, testified that, given this degree of fortification, he believed it would have been extremely unusual for a mere drug user, as opposed to someone involved in the drug operation, to be allowed inside the house: "This house was unique in that it was so heavily fortified. It was designed specifically to deal through a window that was fortified with steel bars and there was a little cutout in the window, the front window next to the door. So as users would come up, they would be dealt [with] through the window. Then they would leave. No one is allowed in the house." Stauffer agreed: "Some houses that we come across, it's very common people knock on the door, they're allowed entry, they remain inside for 30 seconds or a minute, they come out, they walk away. That's the way it's typically done. However, this one they only sold through the window, so it's unique."

Stauffer testified that when the search team initially approached the front entrance to the house, the metal security door was closed but the inner wooden door was open. There were lights on inside and Stauffer could see into the house, although not very clearly. He saw a couple of people inside the living room and he yelled "L.A.P.D." A woman (apparently Foster) immediately ran over and slammed the wooden door in his face. Before the door closed, however, Stauffer saw a male figure run across the back of the living room into a hallway that led to the bathroom.

Stauffer testified that, after the three or four minutes it took to penetrate the front doors, the first thing he saw upon entering the house was two women lying on the living room floor.[1] Stauffer then saw defendant Riley lying in the hallway directly outside the bathroom and just a short distance from the kitchen. While lifting Riley up to handcuff him, Armando saw "a small amber vial underneath his torso." Stauffer testified this vial "contain[ed] a fluid resembling PCP." In his pocket, Riley had $275 in small bills.[2]

---

[1] The occupants were apparently lying on the floor in response to commands from the search team as they broke into the house. In total, the police found four people inside the house: Riley, Foster, and two other women.

[2] There were nine $20 bills, three $10 bills, seven $5 bills, and thirty $1 bills.

In the bathroom, Stauffer saw a broken plate next to the toilet, with little pieces of rock cocaine next to it, as well as a plate in the bathtub that had some cocaine residue on it. The toilet was "running as if it had just been flushed." A razor blade with rock cocaine residue on it was floating inside the toilet. Behind the kitchen stove, Stauffer found "six or so . . . little vials containing the PCP as well as a large baggie containing some off-white solids, which looked like rock cocaine." Stauffer testified Riley had been lying in the hallway just three or four feet away from the bathroom, and about five feet from the kitchen stove. Riley was the only person found in this area of the house.

Inside the house, police found a total of 7.72 grams of rock cocaine, 23.94 grams of marijuana, and a "large quantity" of PCP. The officers also recovered a digital scale, eyedroppers, a large vial of PCP, and some small empty vials.[3] In addition to the $275 found on Riley, there was almost another $3,000 in the house. Nothing commonly used to ingest PCP or rock cocaine was found. Based on this evidence, Stauffer concluded the drugs in the house were possessed for sale.

2. *Defense evidence.*

Riley did not testify.

Charles Freeman was a property manager for residential and commercial establishments. He testified that in April 2013 Riley was working for him as "a resident [apartment] manager, which means he lives on site." However, Riley did not receive a regular salary for this work: "[T]he apartment is his compensation. He has a free rental apartment." The following colloquy occurred:

"Q. . . . So Mr. Riley wouldn't necessarily collect a paycheck then from the property management company?

"A. Not on a consistent basis on the 1st and the 15th [of the month], no.

"Q. And if and when he would be compensated in money, would it be [in] cash?

"A. It will be petty cash reimbursement . . . ."

---

[3]  Stauffer testified the eyedroppers would have been used to refill the empty vials.

6

3. *Verdict and judgment.*

The jury found Riley guilty of possessing PCP for sale and simple possession of cocaine base, with a prior drug-related conviction enhancement. (Health & Saf. Code, §§ 11350, subd. (a), 11378.5, 11370.2, subd. (b).) He was sentenced to seven years in county jail. Riley filed a timely notice of appeal.

## CONTENTIONS

Riley contends: (1) there was insufficient evidence to support his convictions; and (2) the trial court erred by failing to give the jury a proper hearsay limiting instruction.

## DISCUSSION

1. *There was sufficient evidence to support Riley's drug convictions.*

Riley contends there was insufficient evidence to support his convictions because he was not shown to be in either physical or constructive possession of the drugs and there was no proof of his intent to sell PCP. This claim is meritless.

    a. *Legal Principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the

7

circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

The reviewing court is to presume the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Ochoa*, *supra*, 6 Cal.4th at p. 1206.) Even if the reviewing court believes the circumstantial evidence might be reasonably reconciled with the defendant's innocence, this alone does not warrant interference with the trier of fact's verdict. (*People v. Towler* (1982) 31 Cal.3d 105, 118.) It does not matter that contrary inferences could have been reasonably derived from the evidence. As our Supreme Court said in *People v. Rodriguez*, *supra*, 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id*. at p. 12, italics added.)

"The elements of possession of narcotics are physical or constructive possession thereof coupled with knowledge of the presence and narcotic character of the drug. [Citations.] Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another. [Citation.] The elements of unlawful possession may be established by circumstantial evidence and any reasonable inferences drawn from such evidence." (*People v. Newman* (1971) 5 Cal.3d 48, 52, disapproved on other grounds by *People v. Daniels* (1975) 14 Cal.3d 857, 862; see also *People v. Harrington* (1970) 2 Cal.3d 991, 998 ["neither exclusive possession of the premises nor physical possession of the drug is required."].)

Case law demonstrates that fairly slight circumstantial evidence can be sufficient to prove a defendant's constructive, nonexclusive possession of drugs.

The defendant in *People v. Newman*, *supra*, 5 Cal.3d 48, was stopped for speeding. Detecting the odor of burnt marijuana, the officer arrested defendant and his two passengers. There was a sealed envelope sitting on a tape deck that was located below the dashboard. Inside the envelope were eight plastic bags containing methedrine. The defendant denied knowing anything about the envelope or its contents, and testified he had been driving a borrowed car. *Newman* affirmed the defendant's conviction of possession for sale because "sufficient circumstantial evidence existed from which the jury could infer that defendant possessed the drugs and had knowledge of their presence, for the envelope containing the drugs was located and visible on the tape deck below the dashboard of the car defendant was driving and was therefore immediately accessible to him and subject to his exclusive or joint dominion and control." (*Id.* at p. 53.)

In *People v. Glass* (1975) 44 Cal.App.3d 772, the defendant was found in bed at his girlfriend's house. When the police walked into the bedroom, defendant pulled the bed covers up over his head. Underneath a pillow, police found a plastic vial and a bag containing amphetamine tablets. *Glass* held "the presence of the amphetamines found in and around the bed where appellant had been lying and the act of pulling up the bed covers over his entire body, including his head, would be sufficient to support a conviction for simple possession." (*Id.* at pp. 775-776.)

b. *Discussion*.

Riley cites *People v. Johnson* (1984) 158 Cal.App.3d 850, as a case where a defendant's conviction of possessing drugs for sale was reversed, even though the "police similarly raided a house and found several people inside along with a large quantity of PCP," and the defendant's "fingerprint was found on one of the [PCP] vials." But the facts in *Johnson* are nothing like the case at bar. The police in that case found six or seven people "milling around" in the main room of what was described as "a sparsely furnished four-room residence in a low-income area of the city." (*Id.* at p. 852.) Johnson and a woman were standing in the kitchen. Two glass bottles containing PCP had been

9

hidden inside a small hole in the kitchen ceiling, and Johnson's fingerprint was found on one of these bottles. There was more PCP in a Listerine bottle in the bathroom. Except for the fingerprint, there was no evidence linking Johnson to the house (i.e., no rent receipts, utility bills, county property records or house keys) and, although the officers had seen Johnson in the front yard of the house three days earlier, they had "never seen [him] nor anyone else make a PCP sale from that location." (*Id*. at p. 853.)

The Court of Appeal reversed Johnson's conviction because there was "no evidence defendant physically possessed the substance in question. Nor was there solid credible evidence of his constructive possession." (*People v. Johnson*, *supra*, 158 Cal.App.3d at p. 853.) The PCP bottles in the ceiling were not visible from where Johnson had been standing, and the fingerprint only demonstrated that Johnson had touched the bottle at some unknown time in the past, a time when the bottle could well have been empty.

Most significantly for our purposes, there was no evidence in *Johnson* – other than the PCP itself – that the house was being used as a site for selling drugs. Here, on the other hand, there was no question the drugs in the house were being possessed for sale as part of an on-site trafficking operation. The only question here was whether the jury could reasonably infer that Riley was a knowing participant in that drug operation. We conclude there was ample circumstantial evidence to prove that fact.

The evidence demonstrated the drug operation involved the sale of marijuana, cocaine, and PCP. Riley was found in a hallway lying on top of a vial of PCP and in very close proximity to *both* the kitchen stove, behind which cocaine and PCP vials were discovered, *and* the bathroom, where someone had apparently just been flushing cocaine down the toilet. The jury could reasonably infer that during the few minutes it took the search team to break into the house, Riley had been trying to hide or destroy as much of the contraband as possible, and thereby escape prosecution. There was also testimony

10

that the currency found in Riley's pocket demonstrated he was actively involved in selling drugs.[4]

In addition, Riley was the only man found inside the house when the search team broke in. Based on Charles's testimony, the jury could have reasonably concluded there were at least two people inside the house – one man and one woman – involved in selling drugs to the marijuana customer. Riley argues, "It is undisputed Charles expressly testified she had been mistaken, and it was in fact a female she heard making the drug sale and even calling the customer 'baby.' " This is inaccurate. All Charles acknowledged was that it was the woman's voice she heard urging the marijuana customer to be patient when he got agitated. Otherwise, Charles consistently testified there was also a man interacting with the marijuana customer, that she heard a man's voice and saw a man's hand at the window taking the customer's $20 and subsequently handing over a bag of marijuana. In fact, Charles's testimony that she heard a man's voice and saw a man's hand was so convincing that, during closing argument, defense counsel tried to persuade the jury that the hand and the voice belonged, not to Riley, but to some unidentified male. Defense counsel's theory was that Riley had been the man who arrived later and wanted to get inside the house to retrieve his jacket. In this scenario, Riley entered the house while the unidentified man was servicing the marijuana customer; Riley then remained in the house (while the unidentified man left) and was still there when the police arrived. A major problem with this theory, however, was that Charles testified she had never laid eyes on Riley before testifying at his trial, and the evidence tended to show Charles would have gotten a good look at the man who came to retrieve his coat.

---

[4]     Possession of currency in particular denominations is typically cited by experienced police officers as evidence that the possessor is engaged in drug trafficking. (See *People v. Chaney* (1991) 234 Cal.App.3d 853, 856-857; *People v. Douglas* (1987) 193 Cal.App.3d 1691, 1694.) Here, Detective Armando testified: "Money is an indicator [of drug sales], especially in small denominations because that's how the users will buy the drugs most commonly in ones and fives, sometimes tens."

In sum, there was sufficient evidence to prove Riley had been involved in the drug trafficking operation going on inside the house, and therefore sufficient evidence to sustain his convictions.

2. *Riley's claim about a faulty limiting instruction does not warrant reversal*.

Riley contends his convictions must be reversed because the trial court failed to give the jury a requested limiting instruction regarding Charles's hearsay testimony. We do not agree.

a. *Background*.

Before the first witness testified in this case, Riley asked the trial court not to admit Charles's testimony regarding the conversation she heard between the marijuana customer and the people inside the house:

"[Defense counsel]: . . . I believe the People are seeking to introduce insofar as while [Charles] was making a controlled buy she observed an unknown man approach the window and state 'Give me some cush,' and then . . . she heard someone inside the house respond, 'Hold on. I'm getting your stuff,' to that effect. There is no hearsay exception for it that would qualify it. To my understanding it was excluded at the preliminary hearing. It should be excluded from this trial as well.

"The Court: All right. Well, it would appear to me that it would be relevant towards any expertise into what's going on with the location, but I can hear further by the People."

The prosecutor argued that the statements Charles would be testifying about did not constitute hearsay: "[S]he heard him ask a question, ask for some water and some cush, which is street vernacular for narcotics. . . . The questions aren't hearsay. There is no assertive conduct in a question and . . . as the interaction continued, [Charles] observed this man on the porch get angry and begin to yell and demand his product and likewise, Your Honor, commands are not hearsay. If someone says, 'Stop right there,' or 'Put down that pen,' there's no assertion being offered for the truth and the same line of reasoning follows with the voice . . . behind the door that was heard. The statement in

12

quotations is . . . 'Just hold on. I'm getting your shit.' Again, that would be a command, Your Honor. No assertive conduct there."

Defense counsel argued in response: "[T]he officers are going to rely on the truth of the matter asserted, namely that a person approached the window and asked for narcotics and that a person inside responded that they would be providing narcotics. There is no other reason for which that statement is being offered."

Rather than directly address these conflicting hearsay analyses, the trial court ruled: "Well, part of these cases[5] has to be an opinion coming from an expert. Experts could rely on hearsay coming to that conclusion. Court rules these statements could come in at least for that fact. And it appears they'll be relevant for the transaction, if you will, but the court will allow the statements to come in or at least the expert to testify as to those matters." Defense counsel lodged an objection to this ruling, and then made another request: "[The] defense would . . . ask that the Court at the time that the statements are offered into evidence consider giving a limiting instruction to the jury so that they are advised as to what significance they are allowed to import to the statement, namely that it is part of the expert's opinion, not for the truth of the matter asserted." The trial court denied the request, saying: "I will not advise the jury of that."

Hence, the jury was not given any limiting instruction at the time Charles testified. During Officer Stauffer's subsequent testimony, he offered his opinion that Riley was part of the drug operation: "I base that opinion on . . . the statements of the N.C.I. [the non-confidential informant, i.e., Charles] that she heard a man's voice negotiating with a customer or what she thought was a customer out on the front porch as well as my own observations of . . . what in my eyes appeared to be a man's figure running out of the room, and once I made entry into that room, I do see what is a man laying right outside the bathroom with the toilet running as if it had just been flushed, narcotics strewn about

---

[5]     This plural reference may have resulted from the fact that, at one point, Riley and Foster were both charged in the same information.

13

inside the bathroom and him being the only man inside the location, it kind of made it easy to decide which man was probably involved."

However, when it came time for final jury instructions, the trial court gave this language taken from CALJIC No. 2.80: "An expert witness is permitted to consider statements made to the witness or a third person that have not been made under oath in court. Statements considered by an expert witness which were made to the witness or a third party person do not prove that what was said was true. The truth of those statements may come from other evidence. You should consider the failure to prove in court that it was made or is true in determining what weight to give to the opinion of the expert."

b. *Discussion.*

On appeal, Riley complains that the trial court "gave only CALJIC 2.80, which just generally advised the jury that an expert may rely on hearsay or other inadmissible evidence, but did not identify any particular hearsay statements. . . . [T]he court refused defense counsel's request for a limiting instruction that related specifically to the hearsay in Charles' statements to police, upon which Stauffer's expert opinion was based. This was error."

We conclude there was no error, but also that, even if there were, the error would have been harmless.

(1) *The hearsay question.*

Riley argues that the statements Charles overheard while standing on the porch were inadmissible hearsay because they did not fall within any hearsay exception and they "lacked any indicia of reliability." We disagree.

Evidence Code section 1200, subdivision (a), states: " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." "Requests and words of direction generally do not constitute hearsay. (*People v. Jurado* (2006) 38 Cal.4th 72, 117 . . . ['Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated.']; *People v. Reyes* (1976) 62 Cal.App.3d 53, 67 . . . quoted with approval in *Jurado* . . . [A declarant's ' "words of direction or

14

authorization do not constitute hearsay since they are not offered to prove the truth of any matter asserted by such words" '].) [¶] However, [sometimes requests or directions] reasonably can be viewed as *implied* hearsay. '[E]vidence of an express statement of a declarant is . . . hearsay evidence if such evidence is offered to prove – not the truth of the matter that is stated in such statement expressly – but the truth of a matter that is stated in such statement by implication.' [Citation.] 'While the ultimate fact the statement is offered to prove is not the matter stated, the truth of the implied statement is a necessary part of the inferential reasoning process.' [Citation.] 'An implied statement may be inferred from an express statement whenever it is reasonable to conclude: (1) that declarant *in fact intended* to make such implied statement, or (2) that a recipient of declarant's express statement would *reasonably believe* that declarant intended by his express statement to make the implied statement.' [Citation.]" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 289.)

*People v. Morgan* (2005) 125 Cal.App.4th 935 (*Morgan*), held that in some circumstances such implied hearsay statements are so inherently reliable that they should fall within a judicially-recognized hearsay exception.[6] In *Morgan*, an officer executing a search warrant for evidence of drug trafficking answered the telephone and heard someone ask to buy drugs. This was held to be hearsay: "[W]hen the man on the phone told Detective Ashworth that 'he was bogeying' and then asked him if he 'had any,' *the relevance of this statement is the implication taken from the spoken words*. While the ultimate fact the statement is offered to prove is not the matter stated, the truth of the implied statement is a necessary part of the inferential reasoning process. The statement is relevant only if the caller actually wants drugs as he states. If he does not want drugs, and is asking for them only to cause trouble for the defendant or as a crank call, then the call has no relevance because it is not circumstantial evidence that defendant is selling drugs. It is the caller's genuine desire for drugs and his belief that he can obtain them by

---

**6** *Morgan* relied on the rule that "appellate courts have the authority to create exceptions to the hearsay rule not found in the Evidence Code. (*In re Cindy L.* (1997) 17 Cal.4th 15, 26-27.)" (*Morgan*, *supra*, 125 Cal.App.4th at p. 946.)

calling the defendant's number that creates the inference that defendant's drugs are possessed for purposes of sale." (*Id.* at p. 943, italics added.)

However, despite this conclusion, *Morgan* went on to find that the evidence was admissible: "The answer to the quandary created by nonassertive statements is not to distort the definition of the hearsay rule and ignore the reality that a request to buy drugs is only relevant if the buyer believes he can buy drugs with his request. The answer is to recognize that the increased reliability of nonassertive statements justify [*sic*] the recognition of an exception to the prohibition on the use of hearsay." (*People v. Morgan*, *supra*, 125 Cal.App.4th at p. 944.) " 'One of the principal goals of the hearsay rule is to exclude declarations when their veracity cannot be tested through cross-examination. When a declarant does not intend to communicate anything, however, his sincerity is not in question and the need for cross-examination is sharply diminished. Thus, an *unintentional message* is presumptively more reliable.' [Citation.] [¶] This rationale applies to the caller's statements in this case. The caller was not intending to assert that [the defendants] were selling methamphetamine; rather, he was attempting to purchase methamphetamine. Because actions speak louder than words, the caller's statements were more reliable than the usual hearsay statement." (*Ibid*., italics added.)

The reasoning in *Morgan* would warrant admitting the statements that Charles overheard while she was on the porch. Although the conversation between the marijuana customer and the two people inside the house did not contain any factual assertions, the conversation statements (i.e., "Where's my marijuana?," "Calm down, it's coming") implied that the speakers were engaged in an *actual* drug sale. And, as *Morgan* teaches, "the increased reliability of nonassertive statements" justifies "an exception to the prohibition on the use of hearsay." (*People v. Morgan*, *supra*, 125 Cal.App.4th at p. 944.) Hence, contrary to Riley's argument, the statements overheard by Charles did not lack indicia of reliability.[7] Applying the rationale of *Morgan*, the overheard

---

[7]      To the extent Riley's "lack of indicia of reliability" argument was only meant to reference the fact that Charles changed her testimony about what the female voice said, the record is clear that Charles never repudiated her testimony about hearing *two different*

16

statements constituted a strong "unintentional message" that these individuals were engaged in a drug transaction.

Thus, we conclude the requested limiting instruction was unnecessary because Charles's testimony did not constitute inadmissible hearsay.

(2) *Any error was harmless.*

*Morgan* disposes of this issue and because we conclude the statements were properly admissible, no limiting instruction was necessary. (See *Morgan*, *supra*, 125 Cal.App.4th at p. 947 ["there was no need for a limiting instruction and no error in failing to give one."].) However, even assuming, arguendo, that the disputed extra-judicial statements constituted inadmissible hearsay and, therefore, the trial court should have given a limiting instruction, we would not find reversible error. (See *People v. Miranda* (1987) 44 Cal.3d 57, 83, disapproved on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4 [trial error under Evidence Code section 355 is tested under the *Watson* standard][8].)

Riley complains the trial court "refused defense counsel's request for a limiting instruction that related specifically to the hearsay in Charles' statements to police, upon which Stauffer's expert opinion was based," and he asserts that under Evidence Code section 355 the court "was required to give" the instruction. Section 355 provides: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." However, although "Evidence Code section 355 requires the court to give appropriate limiting instructions if properly requested, . . . the timing of these instructions is in the trial court's discretion. [Citations.] Thus, *the trial court is not obliged to give limiting instructions the moment they are*

---

*voices* – a man's and a woman's – coming from inside the house in connection with the marijuana customer's transaction.

[8] See *People v. Watson* (1956) 46 Cal.2d 818, 836 (test is whether " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error' ").

*requested or when the limited evidence is presented; subsequent instruction can be sufficient in a proper case.* [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 533-534, italics added.)

Certainly giving this limiting instruction immediately before the witness testified would have alerted the jury as to which hearsay evidence the instruction was talking about. But in this case, giving the instruction at the end of the trial did not make a substantial difference. The jury was instructed that, although expert witnesses may rely on "statements made to the witness or a third person that have not been made under oath in court," such statements "do not prove that what was said was true." The jury was further instructed that "[t]he truth of those statements may come from other evidence," and that a "failure to prove in court that it was made or is true" should be considered "in determining what weight to give to the opinion of the expert." Stauffer testified his opinion – that Riley had been present inside the house for the purpose of selling drugs – was based on the extra-judicial statements Charles heard at the scene, as well as what Stauffer himself observed at the scene during and after the search team's forced entry into the house. In other words, the only extra-judicial statements the instruction could have been referring to were the statements Charles overheard while she was standing on the porch.

Moreover, Riley had been afforded a full opportunity to test the reliability of the disputed extra-judicial statements because Charles testified and she was subject to extensive cross-examination regarding what she heard. An audio tape taken from the recording device worn by Charles while she made the drug buy was played at trial, so the jury also heard some of the extra-judicial statements being spoken. In addition, even stripped of all the actual words spoken, Charles's testimony would have still incriminated Riley because the mere fact that she heard both male and female *voices* coming from inside the house was inculpatory evidence. Given that Riley was the only male found

18

when the police raided the house, this testimony still would have been persuasive evidence that he was the man Charles heard talking to the marijuana customer.[9]

For these reasons, we find there was no instructional error. Even if there had been, it did not contribute to the verdict obtained.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

_____

[9] Riley's passing suggestion that there was a confrontation clause violation here is also meritless. The confrontation clause only applies to testimonial hearsay. (*Davis v. Washington* (2006) 547 U.S. 813, 823-826 [165 L.Ed.2d 224].) Testimonial statements consist of "statements, made with some formality, which, viewed objectively, are for the primary purpose of establishing and proving facts for possible use in a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984, fn. 14, italics omitted.) The extra-judicial statements here do not meet that test.